**DC COMICS INC., Plaintiff,**

v.

**UNLIMITED MONKEY BUSINESS, INC., et al., Defendants.**

**Civ. A. No. C82–2264A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 11, 1984.

Miles Alexander, Joseph Beck, Jerre B. Swann, Gail Tusan Joyner, Atlanta, Ga., for plaintiff.

Francis M. Pinckney, Charlotte, N.C., John Pennington, Atlanta, Ga., for defendants.

## ORDER

SHOOB, District Judge.

This action arises under federal trademark and copyright statutes and under state law. Plaintiff holds copyrights and trademarks pertaining to the fictional characters SUPERMAN and WONDER WOMAN, their names and attributes, and has exploited those properties in the distribution of comic books, films, and merchandise. Defendants are a corporation and its owners that engage in the franchising of "singing telegram" companies, and a partnership that operates one of the franchises. Among the skits performed by defendants and their licensees are two that feature characters named "Super Stud" and "Wonder Wench". Plaintiff alleges that the use of those characters infringes upon its property rights, and seeks a permanent injunction barring the use of those characters.

Presently before the Court are a motion by defendants for summary judgment and a motion by plaintiff for partial summary judgment as to liability. The parties agree that liability in this case may be decided on cross-motions for summary judgment.

The following facts are undisputed.

1. Plaintiff DC Comics Inc., a New York corporation, is the publisher and successor in interest of the former publishers of comic magazines about the adventures of SUPERMAN and WONDER WOMAN.

2. Defendant Unlimited Monkey Business, Inc. ("UMB"), is a Georgia corporation; defendant Monkey Business Singing Telegram Service ("MBSTS") is a partnership with its principal place of business in Atlanta, Georgia; and defendants Michael and Jeanie Batchelor, the sole owners of UMB, are the president and the vice-president, respectively, of UMB and are partners in MBSTS.

3. UMB licenses or franchises the performance of singing telegrams. At the time suit was commenced, it had licensed or franchised 13 companies and firms pursuant to written franchise or license agreements. MBSTS, through its employees, performs singing telegrams in the Atlanta area.

4. Since 1938, plaintiff and its predecessor in interest have distributed millions of copies of its SUPERMAN comic books. The stories depicted in these comic books consistently have employed the device of a double identity—Clark Kent and SUPERMAN—to tell the stories.

5. SUPERMAN consistently has worn a blue, skin-tight suit with a yellow, five-sided shield on the chest, emblazoned with the red letter "S"; a red cape, trunks, and boots; and a gold belt.

6. In virtually every one of these millions of plaintiff's comic books, one or more, and often all, of the following identifying elements have been included:

(a) the words, "mild-mannered", to describe Clark Kent's character, as in "Clark Kent, mild-mannered reporter for the Daily Planet";

(b) Clark Kent's co-worker at the Daily Planet, Jimmy Olsen;

(c) Clark Kent saying, "This looks like a job for SUPERMAN," then dramatically removing his glasses and unbuttoning his business shirt (often in a telephone booth) to reveal the famous SUPERMAN costume;

(d) the phrases, "faster than a speeding bullet! more powerful than a locomotive! able to leap tall buildings at a single bound!";

(e) the exclamation, "It's a bird, it's a plane, it's SUPERMAN!"; and

(f) the reference to SUPERMAN having been born on the mythical planet, "Krypton".

7. For many years, the following words were included in the introduction to the SUPERMAN radio programs broadcast nationwide:

Faster than a speeding bullet! More powerful than a locomotive! Able to leap tall buildings at a single bound! Look! Up in the sky! It's a bird! It's a plane! It's SUPERMAN!

Yes, it's SUPERMAN—who, disguised as Clark Kent, mild-mannered reporter for a great metropolitan newspaper, fights a never ending battle for truth, justice, and the American Way!

8. Since 1941, plaintiff and its predecessor in interest have distributed millions of copies of its WONDER WOMAN comic books. In virtually every issue, WONDER WOMAN has worn a costume of patriotic colors and symbols comprising a red top bearing gold, wing-tipped insignia; a gold and white star-spangled bottom; and red boots. The costume consistently has also included the following important accessories:

(a) a gold tiara headband with a red star on it (which also serves as a radio receiver);

(b) a magic lasso or rope which she wraps around her captives to compel them to tell the truth;

(c) a gold belt which enables WONDER WOMAN to compel obedience; and

(d) wrist bracelets on each arm, often used to deflect bullets.

9. WONDER WOMAN also has appeared consistently in the above-described costume and accessories in animated and live-action television series broadcast throughout the country for many years.

10. For more than forty years, plaintiff has used its SUPERMAN and WONDER WOMAN marks to designate origin. As a result, these marks have been regarded by the public as indicating plaintiff as a source of a variety of literary works, products, and services. During this period, plaintiff and its licensees have been engaged in the production, distribution, and sale, in interstate and foreign commerce, as well as in Georgia, of books, magazines, radio and television programs, movies, and a wide variety of goods and services bearing the wordmarks SUPERMAN and WONDER WOMAN, the distinctive SUPERMAN and WONDER WOMAN logotypes, various design marks depicting SUPERMAN and the "S" shield design associated therewith, various design marks depicting WONDER WOMAN, and various slogans and phrases associated with the characters.

11. Plaintiff has licensed thousands of children's products bearing the SUPERMAN name, costumes, images, phrases, and logos, ranging from school bags to Halloween costumes to wallpaper. Plaintiff strictly adheres to its policy of taking great care in the selection of licensees who will responsibly utilize and promote the SUPERMAN character, costumes, phrases, names, and images; has maintained strict requirements with respect to the quality of products used with the character and properties and with respect to the use of the character and properties themselves with products; and has required permanent and legible copyright and trademark notices to be affixed to all licensed products. This licensing activity has generated several billion dollars worth of income for plaintiff over the past fifteen years.

12. Plaintiff has licensed thousands of children's products bearing the WONDER WOMAN name, costume, images, and logos, and ranging from pajamas and night slippers to pillows to school supplies. Plaintiff strictly adheres to its policy of taking great care in the selection of licensees who will responsibly utilize and promote the WONDER WOMAN character, costume, name, and images; has maintained strict requirements with respect to the quality of products used with the character and properties and with respect to the use of the character and properties themselves with products; and has required permanent and legible copyright and trademark notices to be affixed to all licensed products. This licensing activity has generated income for plaintiff in excess of $80,000,000 during the past ten years.

13. One or more of defendants prepared and circulated to UMB's licensees a script suggesting that the Super Stud character identify himself as "Dark Dent", a reporter from the Monkey Business "Daily News". Assisted by a toy monkey identified to the audience as "Jimmy Olson", Dark Dent concludes, according to the script, that he is too "mild-mannered" to perform the singing telegram. Dark Dent then removes his glasses and unbuttons his shirt to reveal a skin-tight costume, declaring, "This must be a job for 'Super Stud.'"

14. The script also suggests that defendants' messengers recite, or authorizes them to recite, the following phrases to the telegram audiences:

(a) faster than a speeding tortoise;

(b) more powerful than an armpit;

(c) able to leap tall broads in a single bound;

(d) it's a nurd;

(e) it's insane;

(f) it's Super Stud.

The script further suggests that Super Stud inform the audience, or authorizes him to inform the audience, that Super Stud comes from "Criptoff" and refers to Dark Dent's leaving his reporter's clothes in a telephone booth.

15. Dark Dent's statements, as he removes his hat and glasses, that he is too "mild-mannered" and that "this must be a job for", by themselves evoke the character of Clark Kent transforming into SUPERMAN.

16. The phrases "Faster than a speeding bullet! More powerful than a locomotive! Able to leap tall buildings in a single bound!", standing alone and by themselves, and without any reference to SUPERMAN, are evocative of the description of plaintiff's character, SUPERMAN.

17. The phrases, "It's a bird! It's a plane! It's ...", are also suggestive, standing alone and without reference to SUPERMAN, of the character SUPERMAN.

18. Until shortly before the commencement of this litigation, the costume worn by Dark Dent beneath his reporter's garb was a blue skin-tight suit with a yellow, five-sided shield on the chest, emblazoned with the red letter "S"; a red cape and trunks; black boots; and a gold belt.

19. Defendant Jeanie Batchelor engaged a seamstress to prepare the yellow, five-sided shields emblazoned with a red letter "S", which were worn on the chest of the Super Stud costume. Defendant Jeanie Batchelor supplied the seamstress with a sample of the yellow, five-sided shield, emblazoned with the red letter "S", which is worn on the chest of the SUPERMAN costume, and instructed the seamstress to duplicate the SUPERMAN shield in preparing the Super Stud shield.

20. All of defendant UMB's franchisees/licensees have performed the Super Stud act in costumes identical or quite similar to the costumes described above, and many of them have utilized numerous of the slogans and dramatic elements mentioned in the script and "franchisee manual".

21. Defendants have supplied Super Stud and Wonder Wench telegram recipients with balloons depicting SUPERMAN and WONDER WOMAN. These balloons themselves are copyrighted, licensed products of plaintiff.

22. An advertisement for defendants' overall business urges that consumers "SEND SUPERMAN to pick up your friends at the airport." (Capitalization in original.) An advertisement for defendants' Super Stud includes a panel of the character "flying away"; an ad for Wonder Wench depicts the character wrapping a magic lasso or rope around a man. In still another ad, the characters say, "Truth, justice, and the American way, but those days are gone."

23. Defendants Jeanie and Michael Batchelor have had repeated access to plaintiff's copyrighted SUPERMAN and WONDER WOMAN works for many years.

24. Defendants' uses of Super Stud and Wonder Wench are commercial, for profit uses, and not educational, non-profit uses.

25. The sole functions of the Super Stud and Wonder Wench acts have been entertainment and comedy, and "to express to the telegram recipient that someone cares enough about them to send a singing telegram in celebration of whatever the occasion might be."

26. The SUPERMAN and WONDER WOMAN characters, story elements, costumes and phrases are the product of substantial, independent, original and creative work by plaintiff.

27. Plaintiff and its predecessor in interest have included the proper statutory notice of copyright in all published copies of the SUPERMAN and WONDER WOMAN works. All such copyrights have been duly registered with the United States Copyright Office and, where appropriate, duly renewed.

28. By virtue of the widespread popularity of the SUPERMAN and WONDER WOMAN stories and their principal characters, and plaintiff's and its licensees' extensive sales and advertising of goods and services under the marks during the past several years, the SUPERMAN and WONDER WOMAN marks have acquired outstanding celebrity and have obtained virtually universal recognition in the United States and throughout the world as unique, distinctive marks symbolizing the extensive goodwill associated with the public image of this hero and heroine.

The various allegations and counts concern three basic legal issues: trademark dilution, trademark infringement (with associated issues of fair or deceptive practices), and copyright infringement. The Court will address each issue separately.

*Dilution*

O.C.Ga.Ann. § 10–1–451 requires a court to enjoin subsequent use by another of the same or any similar trademark, trade name, label, or form of advertisement if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the trademark, trade name, label, or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services....

On the undisputed facts, it is clear that defendants have used the same and similar trade names in their advertising and in their products, and the same and similar labels in their costumes. There is also a clear likelihood of dilution of the distinctive quality of plaintiff's trademarks and trade names. Summary judgment in favor of plaintiff on the issue of liability under § 10–1–451 is therefore appropriate.

*Trademark Infringement and Unfair Competition*

Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), provides as follows:

Any person who shall, without consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided....

Defendants' use of the SUPERMAN costume, and in particular the "S" chest shield; their use of SUPERMAN and WONDER WOMAN balloons in skits; the

presence of the SUPERMAN name in their advertising; and their colorable imitations of the WONDER WOMAN costume all establish a likelihood of confusion, mistake, or deception as to the source of the singing telegram services and as to any affiliation between plaintiff and defendants. Plaintiff is therefore entitled to summary judgment as to liability under 15 U.S.C. § 1114(1).

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), states, in pertinent part:

Any person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by ... any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

■ On the undisputed facts, defendants' use of SUPERMAN and WONDER WOMAN marks in advertising and in the performance of their services tends falsely to describe and represent defendants' services. By trading upon the goodwill of the marks, established through plaintiff's ingenuity and effort, and by altering the denotation and connotation of those marks, defendants are likely to damage plaintiff. In making this conclusion, the Court observes that both plaintiff and defendants are engaged in the commercial exploitation of entertainment. The control, use, and modification of plaintiff's characters for singing telegram services must be left in plaintiff's hands. Summary judgment for plaintiff as to liability under 15 U.S.C. § 1125(a) is therefore proper.

O.C.Ga.Ann. § 10–1–372 states, in pertinent part:

(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

.    .    .    .    .

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;

.    .    .    .    .

(b) In order to prevail in an action under this part, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

■ On the undisputed facts, defendants have caused likelihood of confusion as to source, sponsorship, and approval of their services and as to affiliation, connection, and association between defendants and plaintiff. The use of the balloons, the costumes, and the names of plaintiff's characters all create the likelihood of confusion. Summary judgment for plaintiff as to liability under O.C.Ga.Ann. § 10–1–372 is therefore warranted.

O.C.Ga.Ann. § 10–1–393 states, in pertinent part:

(a) Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful.

(b) By way of illustration only and without limiting the scope of subsection (a) of this Code section, the following practices are declared unlawful:

.    .    .    .    .

(2) Causing actual confusion or actual misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causing actual confusion or actual misunderstanding as to affiliation, connection, or association with or certification by another....

Plaintiff has offered several examples of actual confusion that defendants have been unable to dispute. The June 2, 1981 *Charlotte (N.C.) Weekly Uptown* showed front-page photographs of "Monkey Business' Wonder Woman" welcoming home a sports celebrity. An article in the *Charlotte Observer* of the same day identified the singing telegram performer in a similar photo

simply as "Wonder Woman". The February, 1979 issue of *Sacramento* features a cover-page color photo of a Monkey Business employee costumed as, and described simply as, "Wonder Woman". The accompanying article includes "Wonder Woman" and "Superman" among characters featured by the singing telegram service. These articles are undisputed evidence of actual confusion as to source, sponsorship, and approval of the Monkey Business services and as to affiliation, connection, and association between defendants and plaintiff. For that reason, plaintiff is entitled to summary judgment as to liability under O.C.Ga.Ann. § 10–1–393.

The decisions announced above regarding plaintiff's statutory claims render unnecessary an evaluation of plaintiff's common-law claims.

*Copyright Infringement*

17 U.S.C. § 106 provides, in pertinent part:

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

.    .    .    .    .

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

■ To establish copyright infringement, a plaintiff must show its ownership of the copyright and copying by defendant. Because direct proof of copying is typically unavailable, a plaintiff may offer circumstantial evidence of copying by showing defendant's access to the protected material and a substantial similarity between plaintiff's and defendant's works. A claim of infringement must overcome a defense of fair use, such as the parody use claimed by defendant in this case.

Access by defendant Jeanie Batchelor to plaintiff's works is undisputed, as is plaintiff's ownership of copyrights in its works. The Court must determine from other undisputed facts whether, as a matter of law, defendants' and plaintiff's works share a substantial similarity and whether defendants' parody defense is valid.

There is no dispute that one script before the Court (Exhibit 4 to Plaintiff's Brief) was provided to licensees of defendants as a model for Super Stud skits. That script culls the most characteristic and most memorable portions of the Superman plots, and the core of the Superman stories—the sequence of events and character development—appears in the Super Stud skits. The similarity—based on plot structure, phrases, costumes, and names—is striking. The words of defendant Jeanie Batchelor reveal the degree of similarity between the Superman and Super Stud stories. After acknowledging that she attended the movie *Superman* in order to see if she could add something else to the Super Stud act, she stated that she could not find anything and that the Super Stud act, as it was, was "pretty complete already". Deposition of Jeanie Batchelor at 95–96.

■ Defendants rely heavily upon the defense of fair use, claiming that their works parody those of plaintiff. 17 U.S.C. § 107 states:

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching ... scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

These factors contribute to an "equitable rule of reason" applicable to particular claims of infringement. *Sony Corp. of America v. Universal City Studios, Inc.*, — U.S. —, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984).

The Court makes the following observations in evaluating the four statutory factors in this case. First, defendants use elements of plaintiff's copyrighted works in commerce: defendant's business embraces franchising and the delivery of greetings or messages combined with entertainment. Second, the copyrighted works include comic books, films, and other audiovisual products that embody much original creative effort and result from substantial labor and expenditure. The creative effort included both the fashioning of ideas and the expression of them in a distinctive manner. The works have created over time a set of distinctive characters that have taken on lives in the public imagination that extend far beyond the reach of the individual works.

Third, the salient features of the alleged parody draw from the most recognizable, and most consistent, expressions of plaintiff's ideas, as embodied in the language and the stories of plaintiff's works. *Cf. Universal City Studios, Inc. v. Kamar Industries, Inc.*, [1982] Copyright L.Rep. (CCH) ¶ 25,452 (S.D.Tex. Sept. 20, 1982) (appropriation of the recurrent phrases from film *E.T.* infringed copyright). The copying goes beyond what is necessary merely to allude to or "conjure up" the object of the parody. *Cf. Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 757 (9th Cir.1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979).

Fourth, there are two types of effect upon the potential market for plaintiff's works that may arise from defendants' alleged parodies. One type of effect concerns the potential for commercial substitution. Plaintiff and defendants conduct similar business, notwithstanding the different sizes of their enterprises. Plaintiff engages in licensing and the selling of entertainment. Defendants engage in franchising and the selling of entertainment: as part of their franchising activity they supply scripts and props to franchise operators. There is a clear potential market for genuine SUPERMAN singing telegrams, as shown by the use by defendants of an advertisement enticing customers to "send Superman to pick up your friends at the airport" and the news coverage of "Wonder Woman" delivering singing telegrams; and plaintiff has the ability to exploit that market. Whether or not plaintiff now exploits that market, the effect of defendants' practices upon plaintiff's potential market is clear: they satisfy demand, at least in part, and create competition for plaintiff as a potential entrant.

█ A second type of effect on the potential market for or value of plaintiff's copyrighted works results from the implicit disparagement and bawdy associations undisputably created by some of defendants' adaptations. This harm is akin to that of dilution in trademark law, but it does not merely lessen the distinctiveness of plaintiff's works: it tarnishes the "all-American" image that plaintiff has labored to create and to preserve. Defendants do not engage in critical comment that constitutes part of the "free flow of ideas" underlying the doctrine of fair use. Instead, they seek to augment the commercial value of their own property by creating new, and detrimental, associations with plaintiff's property.[1] Defendants have the right to discuss,

---

1. For example, the suggested script for the Super Stud act includes references to aphrodisiacs, "clap," being "horny," vaginal deodorant, and "leaping tall broads." In addition, the character

and even to criticize, plaintiff's stories and characterizations; but defendants do not have the right to change plaintiff's property by altering the popular associations carefully wrought by plaintiffs. Parody in its proper role creates something new by drawing from the old; but when it has the effect of refashioning or destroying the old, it is not protected.

■ In addition to the four factors necessarily considered in a determination of fair use, the Court considers a fifth factor.[2] There is a difference between works that incidentally parody other works while creating a genuinely distinct product and those that comprise little more than an adaptation of another's original work. Here both of the challenged skits have been sold on the strength of their association with plaintiff's originals, not on the strength of defendants' imagination and originality. Trading upon the imagination and originality of another is not fair use.

■ On the basis of these observations, the Court decides that defendants are not entitled to claim fair use as a defense to plaintiff's claim of infringement. Because the Court finds, upon the undisputed facts, that defendants have infringed plaintiff's copyrights and that defendants have no defense of fair use, the Court concludes that plaintiff is entitled to summary judgment as to liability for copyright infringement.

### Conclusion

For the reasons stated above, the Court GRANTS plaintiff's motion for summary judgment as to liability and DENIES defendants' motion for summary judgment. The Court PERMANENTLY ENJOINS each of the defendants, jointly and severally, as well as each and every one of their respective partners, agents, servants, employees and all other individuals, firms, corporations, associations and partnerships affiliated, associated or acting in concert with them or allied with them in any way or having notice of such order:

(a) From directly or indirectly distributing, exhibiting, performing or otherwise publishing or exploiting the singing telegrams or any other vehicle utilizing the characters identified by defendant as "Super Stud" and "Wonder Wench" and any and all materials used to promote or advertise said telegrams;

(b) From directly or indirectly distributing, exhibiting, performing or otherwise publishing or exploiting any other singing telegrams, performances, or advertising materials, costumes or any other vehicle, which use in any manner characters, scenes or stories copied or derived from or substantially similar to those depicted in plaintiff's trademarked or copyrighted SUPERMAN and WONDER WOMAN literary or dramatic works;

(c) From directly or indirectly distributing, exhibiting, performing or otherwise publishing or exploiting singing telegrams or other materials which so resemble plaintiff's trademarks, service marks or forms of advertisements as to be likely to cause confusion, deception or mistake;

(d) From passing off or inducing or enabling others to sell or pass off any goods or services as those authorized by plaintiffs which are not plaintiff's or not produced under the control and supervision of plaintiff or authorized for sale by plaintiff in connection with its marks;

delivers the message by retrieving it from inside his pants.

**2.** Section 107 does not limit a court to consideration of only the four factors enumerated in the statute. "[T]he endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute. The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis." H.Rep. No. 94–1476, p. 66, U.S.Code Cong. & Admin.News 1976, pp. 5659, 5680, *quoted in Sony Corp.*, 104 S.Ct. at 792 n. 31.

(e) From infringing in any manner the trademarks or copyrights of plaintiff in the literary and dramatic characters of SUPERMAN and WONDER WOMAN and the facts and situations associated with plaintiff's copyrighted SUPERMAN and WONDER WOMAN literary and dramatic works;

(f) From further diluting and infringing plaintiff's trademarks, service marks, tradenames and forms of advertisement or damaging plaintiff's good will and reputation;

(g) From engaging in false designations of origin, false descriptions or false representations in violation of Section 43(a) of the Lanham Act or from otherwise engaging in unfair or deceptive trade practices or competing unfairly with plaintiff in any manner whatsoever.