CAMPBELL, AKA SKYYWALKER, ET AL. *v.* ACUFF-ROSE MUSIC, INC.

No. 92–1292.   Argued November 9, 1993—Decided March 7, 1994

SOUTER, J., delivered the opinion for a unanimous Court. KENNEDY, J., filed a concurring opinion, *post*, p. 596.

*Bruce S. Rogow* argued the cause for petitioners. With him on the briefs was *Alan Mark Turk*.

*Sidney S. Rosdeitcher* argued the cause for respondent. With him on the brief were *Peter L. Felcher* and *Stuart M. Cobert*.*

JUSTICE SOUTER delivered the opinion of the Court.

We are called upon to decide whether 2 Live Crew's commercial parody of Roy Orbison's song, "Oh, Pretty Woman,"

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union by *Steven F. Reich, Steven R. Shapiro, Marjorie Heins,* and *John A. Powell;* for Capitol Steps Production, Inc., et al. by *William C. Lane;* for the Harvard Lampoon, Inc., by *Robert H. Loeffler* and *Jonathan Band;* for the PEN American Center by *Leon Friedman;* and for Robert C. Berry et al. by *Alfred C. Yen.*

Briefs of *amici curiae* urging affirmance were filed for the National Music Publishers' Association, Inc., et al. by *Marvin E. Frankel* and *Michael S. Oberman;* and for Fred Ebb et al. by *Stephen Rackow Kaye, Charles S. Sims,* and *Jon A. Baumgarten.*

Briefs of *amici curiae* were filed for Home Box Office et al. by *Daniel M. Waggoner, P. Cameron DeVore, George Vradenburg, Bonnie Bogin,* and *Richard Cotton;* and for Warner Bros. by *Cary H. Sherman* and *Robert Alan Garrett.*

may be a fair use within the meaning of the Copyright Act of 1976, 17 U. S. C. § 107 (1988 ed. and Supp. IV). Although the District Court granted summary judgment for 2 Live Crew, the Court of Appeals reversed, holding the defense of fair use barred by the song's commercial character and excessive borrowing. Because we hold that a parody's commercial character is only one element to be weighed in a fair use enquiry, and that insufficient consideration was given to the nature of parody in weighing the degree of copying, we reverse and remand.

## I

In 1964, Roy Orbison and William Dees wrote a rock ballad called "Oh, Pretty Woman" and assigned their rights in it to respondent Acuff-Rose Music, Inc. See Appendix A, *infra*, at 594. Acuff-Rose registered the song for copyright protection.

Petitioners Luther R. Campbell, Christopher Wongwon, Mark Ross, and David Hobbs are collectively known as 2 Live Crew, a popular rap music group.[1] In 1989, Campbell wrote a song entitled "Pretty Woman," which he later described in an affidavit as intended, "through comical lyrics, to satirize the original work . . . ." App. to Pet. for Cert. 80a. On July 5, 1989, 2 Live Crew's manager informed Acuff-Rose that 2 Live Crew had written a parody of "Oh, Pretty Woman," that they would afford all credit for ownership and authorship of the original song to Acuff-Rose, Dees, and Orbison, and that they were willing to pay a fee for the use they wished to make of it. Enclosed with the letter were a copy of the lyrics and a recording of 2 Live Crew's song. See Appendix B, *infra*, at 595. Acuff-Rose's agent refused permission, stating that "I am aware of the success

---

[1] Rap has been defined as a "style of black American popular music consisting of improvised rhymes performed to a rhythmic accompaniment." The Norton/Grove Concise Encyclopedia of Music 613 (1988). 2 Live Crew plays "[b]ass music," a regional, hip-hop style of rap from the Liberty City area of Miami, Florida. Brief for Petitioners 34.

enjoyed by 'The 2 Live Crews', but I must inform you that we cannot permit the use of a parody of 'Oh, Pretty Woman.'" App. to Pet. for Cert. 85a. Nonetheless, in June or July 1989,[2] 2 Live Crew released records, cassette tapes, and compact discs of "Pretty Woman" in a collection of songs entitled "As Clean As They Wanna Be." The albums and compact discs identify the authors of "Pretty Woman" as Orbison and Dees and its publisher as Acuff-Rose.

Almost a year later, after nearly a quarter of a million copies of the recording had been sold, Acuff-Rose sued 2 Live Crew and its record company, Luke Skyywalker Records, for copyright infringement. The District Court granted summary judgment for 2 Live Crew,[3] reasoning that the commercial purpose of 2 Live Crew's song was no bar to fair use; that 2 Live Crew's version was a parody, which "quickly degenerates into a play on words, substituting predictable lyrics with shocking ones" to show "how bland and banal the Orbison song" is; that 2 Live Crew had taken no more than was necessary to "conjure up" the original in order to parody it; and that it was "extremely unlikely that 2 Live Crew's song could adversely affect the market for the original." 754 F. Supp. 1150, 1154–1155, 1157–1158 (MD Tenn. 1991). The District Court weighed these factors and held that 2 Live Crew's song made fair use of Orbison's original. *Id.*, at 1158–1159.

The Court of Appeals for the Sixth Circuit reversed and remanded. 972 F. 2d 1429, 1439 (1992). Although it assumed for the purpose of its opinion that 2 Live Crew's song

---

[2] The parties argue about the timing. 2 Live Crew contends that the album was released on July 15, and the District Court so held. 754 F. Supp. 1150, 1152 (MD Tenn. 1991). The Court of Appeals states that Campbell's affidavit puts the release date in June, and chooses that date. 972 F. 2d 1429, 1432 (CA6 1992). We find the timing of the request irrelevant for purposes of this enquiry. See n. 18, *infra,* discussing good faith.

[3] 2 Live Crew's motion to dismiss was converted to a motion for summary judgment. Acuff-Rose defended against the motion, but filed no cross-motion.

was a parody of the Orbison original, the Court of Appeals thought the District Court had put too little emphasis on the fact that "every commercial use . . . is presumptively . . . unfair," *Sony Corp. of America* v. *Universal City Studios, Inc.,* 464 U. S. 417, 451 (1984), and it held that "the admittedly commercial nature" of the parody "requires the conclusion" that the first of four factors relevant under the statute weighs against a finding of fair use. 972 F. 2d, at 1435, 1437. Next, the Court of Appeals determined that, by "taking the heart of the original and making it the heart of a new work," 2 Live Crew had, qualitatively, taken too much. *Id.,* at 1438. Finally, after noting that the effect on the potential market for the original (and the market for derivative works) is "undoubtedly the single most important element of fair use," *Harper & Row, Publishers, Inc.* v. *Nation Enterprises,* 471 U. S. 539, 566 (1985), the Court of Appeals faulted the District Court for "refus[ing] to indulge the presumption" that "harm for purposes of the fair use analysis has been established by the presumption attaching to commercial uses." 972 F. 2d, at 1438–1439. In sum, the court concluded that its "blatantly commercial purpose . . . prevents this parody from being a fair use." *Id.,* at 1439.

We granted certiorari, 507 U. S. 1003 (1993), to determine whether 2 Live Crew's commercial parody could be a fair use.

## II

It is uncontested here that 2 Live Crew's song would be an infringement of Acuff-Rose's rights in "Oh, Pretty Woman," under the Copyright Act of 1976, 17 U. S. C. § 106 (1988 ed. and Supp. IV), but for a finding of fair use through parody.[4]

---

[4] Section 106 provides in part:

"Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

"(1) to reproduce the copyrighted work in copies or phonorecords;

"(2) to prepare derivative works based upon the copyrighted work;

From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, "[t]o promote the Progress of Science and useful Arts . . . ." U. S. Const., Art. I, § 8, cl. 8.[5] For as Justice Story explained, "[i]n truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before." *Emerson* v. *Davies,* 8 F. Cas. 615, 619 (No. 4,436) (CCD Mass. 1845). Similarly, Lord Ellenborough expressed the inherent tension in the need simultaneously to protect copyrighted material and to allow others to build upon it when he wrote, "while I shall think myself bound to secure every man in the enjoyment of his copy-right, one must not put manacles upon science."

"(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . ."

A derivative work is defined as one "based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U. S. C. § 101.

2 Live Crew concedes that it is not entitled to a compulsory license under § 115 because its arrangement changes "the basic melody or fundamental character" of the original. § 115(a)(2).

[5] The exclusion of facts and ideas from copyright protection serves that goal as well. See § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery . . ."); *Feist Publications, Inc.* v. *Rural Telephone Service Co.,* 499 U. S. 340, 359 (1991) ("[F]acts contained in existing works may be freely copied"); *Harper & Row, Publishers, Inc.* v. *Nation Enterprises,* 471 U. S. 539, 547 (1985) (copyright owner's rights exclude facts and ideas, and fair use).

*Carey* v. *Kearsley,* 4 Esp. 168, 170, 170 Eng. Rep. 679, 681 (K. B. 1803). In copyright cases brought under the Statute of Anne of 1710,[6] English courts held that in some instances "fair abridgements" would not infringe an author's rights, see W. Patry, The Fair Use Privilege in Copyright Law 6–17 (1985) (hereinafter Patry); Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105 (1990) (hereinafter Leval), and although the First Congress enacted our initial copyright statute, Act of May 31, 1790, 1 Stat. 124, without any explicit reference to "fair use," as it later came to be known,[7] the doctrine was recognized by the American courts nonetheless.

In *Folsom* v. *Marsh,* 9 F. Cas. 342 (No. 4,901) (CCD Mass. 1841), Justice Story distilled the essence of law and methodology from the earlier cases: "look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work." *Id.,* at 348. Thus expressed, fair use remained exclusively judge-made doctrine until the passage of the 1976 Copyright Act, in which Justice Story's summary is discernible:[8]

"§ 107. Limitations on exclusive rights: Fair use

"Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular

---

[6] An Act for the Encouragement of Learning, 8 Anne, ch. 19.

[7] Patry 27, citing *Lawrence* v. *Dana,* 15 F. Cas. 26, 60 (No. 8,136) (CCD Mass. 1869).

[8] Leval 1105. For a historical account of the development of the fair use doctrine, see Patry 1–64.

case is a fair use the factors to be considered shall include—

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

"(4) the effect of the use upon the potential market for or value of the copyrighted work.

"The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors." 17 U. S. C. § 107 (1988 ed. and Supp. IV).

Congress meant § 107 "to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way" and intended that courts continue the common-law tradition of fair use adjudication. H. R. Rep. No. 94–1476, p. 66 (1976) (hereinafter House Report); S. Rep. No. 94–473, p. 62 (1975) (hereinafter Senate Report). The fair use doctrine thus "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Stewart* v. *Abend,* 495 U. S. 207, 236 (1990) (internal quotation marks and citation omitted).

The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis. *Harper & Row,* 471 U. S., at 560; *Sony,* 464 U. S., at 448, and n. 31; House Report, pp. 65–66; Senate Report, p. 62. The text employs the terms "including" and "such as" in the preamble paragraph to indicate the "illustrative and not limitative" function of the examples given, § 101; see *Harper & Row, supra,* at 561, which thus provide only general guidance about the sorts of copying that courts and

Congress most commonly had found to be fair uses.[9]  Nor may the four statutory factors be treated in isolation, one from another.  All are to be explored, and the results weighed together, in light of the purposes of copyright. See Leval 1110–1111; Patry & Perlmutter, Fair Use Misconstrued: Profit, Presumptions, and Parody, 11 Cardozo Arts & Ent. L. J. 667, 685–687 (1993) (hereinafter Patry & Perlmutter).[10]

A

The first factor in a fair use enquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." § 107(1).  This factor draws on Justice Story's formulation, "the nature and objects of the selections made."  *Folsom* v. *Marsh, supra,* at 348.  The enquiry here may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news report-

---

[9] See Senate Report, p. 62 ("[W]hether a use referred to in the first sentence of section 107 is a fair use in a particular case will depend upon the application of the determinative factors").

[10] Because the fair use enquiry often requires close questions of judgment as to the extent of permissible borrowing in cases involving parodies (or other critical works), courts may also wish to bear in mind that the goals of the copyright law, "to stimulate the creation and publication of edifying matter," Leval 1134, are not always best served by automatically granting injunctive relief when parodists are found to have gone beyond the bounds of fair use.  See 17 U. S. C. § 502(a) (court "*may* . . . grant . . . injunctions on such terms as it may deem reasonable to prevent or restrain infringement") (emphasis added); Leval 1132 (while in the "vast majority of cases, [an injunctive] remedy is justified because most infringements are simple piracy," such cases are "worlds apart from many of those raising reasonable contentions of fair use" where "there may be a strong public interest in the publication of the secondary work [and] the copyright owner's interest may be adequately protected by an award of damages for whatever infringement is found"); *Abend* v. *MCA, Inc.,* 863 F. 2d 1465, 1479 (CA9 1988) (finding "special circumstances" that would cause "great injustice" to defendants and "public injury" were injunction to issue), aff'd *sub nom. Stewart* v. *Abend,* 495 U. S. 207 (1990).

ing, and the like, see § 107. The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supersede[s] the objects" of the original creation, *Folsom* v. *Marsh, supra,* at 348; accord, *Harper & Row, supra,* at 562 ("supplanting" the original), or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative." Leval 1111. Although such transformative use is not absolutely necessary for a finding of fair use, *Sony, supra,* at 455, n. 40,[11] the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, see, *e. g., Sony, supra,* at 478–480 (BLACKMUN, J., dissenting), and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

This Court has only once before even considered whether parody may be fair use, and that time issued no opinion because of the Court's equal division. *Benny* v. *Loew's Inc.,* 239 F. 2d 532 (CA9 1956), aff'd *sub nom. Columbia Broadcasting System, Inc.* v. *Loew's Inc.,* 356 U. S. 43 (1958). Suffice it to say now that parody has an obvious claim to transformative value, as Acuff-Rose itself does not deny. Like less ostensibly humorous forms of criticism, it can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one. We thus line up with the courts that have held that parody, like other comment or criticism, may claim fair use under § 107. See, *e. g., Fisher* v. *Dees,* 794 F. 2d 432 (CA9 1986) ("When Sonny Sniffs Glue," a parody of "When Sunny Gets Blue," is fair use); *Elsmere Music, Inc.* v. *National Broadcasting Co.,* 482 F. Supp. 741

---

[11] The obvious statutory exception to this focus on transformative uses is the straight reproduction of multiple copies for classroom distribution.

(SDNY), aff'd, 623 F. 2d 252 (CA2 1980) ("I Love Sodom," a "Saturday Night Live" television parody of "I Love New York," is fair use); see also House Report, p. 65; Senate Report, p. 61 ("[U]se in a parody of some of the content of the work parodied" may be fair use).

The germ of parody lies in the definition of the Greek *parodeia*, quoted in Judge Nelson's Court of Appeals dissent, as "a song sung alongside another." 972 F. 2d, at 1440, quoting 7 Encyclopedia Britannica 768 (15th ed. 1975). Modern dictionaries accordingly describe a parody as a "literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule,"[12] or as a "composition in prose or verse in which the characteristic turns of thought and phrase in an author or class of authors are imitated in such a way as to make them appear ridiculous."[13] For the purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works. See, *e. g., Fisher* v. *Dees, supra,* at 437; *MCA, Inc.* v. *Wilson,* 677 F. 2d 180, 185 (CA2 1981). If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.[14] Parody needs to mimic

---

[12] American Heritage Dictionary 1317 (3d ed. 1992).

[13] 11 Oxford English Dictionary 247 (2d ed. 1989).

[14] A parody that more loosely targets an original than the parody presented here may still be sufficiently aimed at an original work to come within our analysis of parody. If a parody whose wide dissemination in the market runs the risk of serving as a substitute for the original or licensed derivatives (see *infra,* at 590–594, discussing factor four), it is more incumbent on one claiming fair use to establish the extent of transformation and the parody's critical relationship to the original. By con-

an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing.[15]   See *ibid.;* Bisceglia, Parody and Copyright Protection: Turning the Balancing Act Into a Juggling Act, in ASCAP, Copyright Law Symposium, No. 34, p. 25 (1987).

The fact that parody can claim legitimacy for some appropriation does not, of course, tell either parodist or judge much about where to draw the line.   Like a book review quoting the copyrighted material criticized, parody may or may not be fair use, and petitioners' suggestion that any parodic use is presumptively fair has no more justification in law or fact than the equally hopeful claim that any use for news reporting should be presumed fair, see *Harper & Row,* 471 U. S., at 561.   The Act has no hint of an evidentiary preference for parodists over their victims, and no workable presumption for parody could take account of the fact that parody often shades into satire when society is lampooned through its creative artifacts, or that a work may contain both parodic and nonparodic elements.   Accordingly, parody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law.

Here, the District Court held, and the Court of Appeals assumed, that 2 Live Crew's "Pretty Woman" contains par-

---

trast, when there is little or no risk of market substitution, whether because of the large extent of transformation of the earlier work, the new work's minimal distribution in the market, the small extent to which it borrows from an original, or other factors, taking parodic aim at an original is a less critical factor in the analysis, and looser forms of parody may be found to be fair use, as may satire with lesser justification for the borrowing than would otherwise be required.

[15] Satire has been defined as a work "in which prevalent follies or vices are assailed with ridicule," 14 Oxford English Dictionary, *supra,* at 500, or are "attacked through irony, derision, or wit," American Heritage Dictionary, *supra,* at 1604.

ody, commenting on and criticizing the original work, whatever it may have to say about society at large. As the District Court remarked, the words of 2 Live Crew's song copy the original's first line, but then "quickly degenerat[e] into a play on words, substituting predictable lyrics with shocking ones . . . [that] derisively demonstrat[e] how bland and banal the Orbison song seems to them." 754 F. Supp., at 1155 (footnote omitted). Judge Nelson, dissenting below, came to the same conclusion, that the 2 Live Crew song "was clearly intended to ridicule the white-bread original" and "reminds us that sexual congress with nameless streetwalkers is not necessarily the stuff of romance and is not necessarily without its consequences. The singers (there are several) have the same thing on their minds as did the lonely man with the nasal voice, but here there is no hint of wine and roses." 972 F. 2d, at 1442. Although the majority below had difficulty discerning any criticism of the original in 2 Live Crew's song, it assumed for purposes of its opinion that there was some. *Id.*, at 1435–1436, and n. 8.

We have less difficulty in finding that critical element in 2 Live Crew's song than the Court of Appeals did, although having found it we will not take the further step of evaluating its quality. The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived.[16] Whether, going beyond that, parody is in good taste or bad does not and should not matter to fair use. As Justice Holmes explained, "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits. At

---

[16] The only further judgment, indeed, that a court may pass on a work goes to an assessment of whether the parodic element is slight or great, and the copying small or extensive in relation to the parodic element, for a work with slight parodic element and extensive copying will be more likely to merely "supersede the objects" of the original. See *infra*, at 586–594, discussing factors three and four.

the one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke." *Bleistein* v. *Donaldson Lithographing Co.*, 188 U. S. 239, 251 (1903) (circus posters have copyright protection); cf. *Yankee Publishing Inc.* v. *News America Publishing, Inc.*, 809 F. Supp. 267, 280 (SDNY 1992) (Leval, J.) ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed") (trademark case).

While we might not assign a high rank to the parodic element here, we think it fair to say that 2 Live Crew's song reasonably could be perceived as commenting on the original or criticizing it, to some degree. 2 Live Crew juxtaposes the romantic musings of a man whose fantasy comes true, with degrading taunts, a bawdy demand for sex, and a sigh of relief from paternal responsibility. The later words can be taken as a comment on the naiveté of the original of an earlier day, as a rejection of its sentiment that ignores the ugliness of street life and the debasement that it signifies. It is this joinder of reference and ridicule that marks off the author's choice of parody from the other types of comment and criticism that traditionally have had a claim to fair use protection as transformative works.[17]

The Court of Appeals, however, immediately cut short the enquiry into 2 Live Crew's fair use claim by confining its treatment of the first factor essentially to one relevant fact, the commercial nature of the use. The court then inflated the significance of this fact by applying a presumption osten-

---

[17] We note in passing that 2 Live Crew need not label their whole album, or even this song, a parody in order to claim fair use protection, nor should 2 Live Crew be penalized for this being its first parodic essay. Parody serves its goals whether labeled or not, and there is no reason to require parody to state the obvious (or even the reasonably perceived). See Patry & Perlmutter 716–717.

sibly culled from *Sony*, that "every commercial use of copyrighted material is presumptively . . . unfair . . . ." *Sony*, 464 U. S., at 451. In giving virtually dispositive weight to the commercial nature of the parody, the Court of Appeals erred.

The language of the statute makes clear that the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character. Section 107(1) uses the term "including" to begin the dependent clause referring to commercial use, and the main clause speaks of a broader investigation into "purpose and character." As we explained in *Harper & Row*, Congress resisted attempts to narrow the ambit of this traditional enquiry by adopting categories of presumptively fair use, and it urged courts to preserve the breadth of their traditionally ample view of the universe of relevant evidence. 471 U. S., at 561; House Report, p. 66. Accordingly, the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness. If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities "are generally conducted for profit in this country." *Harper & Row, supra*, at 592 (Brennan, J., dissenting). Congress could not have intended such a rule, which certainly is not inferable from the common-law cases, arising as they did from the world of letters in which Samuel Johnson could pronounce that "[n]o man but a blockhead ever wrote, except for money." 3 Boswell's Life of Johnson 19 (G. Hill ed. 1934).

*Sony* itself called for no hard evidentiary presumption. There, we emphasized the need for a "sensitive balancing of interests," 464 U. S., at 455, n. 40, noted that Congress had "eschewed a rigid, bright-line approach to fair use," *id.*, at

449, n. 31, and stated that the commercial or nonprofit educational character of a work is "not conclusive," *id.*, at 448–449, but rather a fact to be "weighed along with other[s] in fair use decisions," *id.*, at 449, n. 32 (quoting House Report, p. 66). The Court of Appeals's elevation of one sentence from *Sony* to a *per se* rule thus runs as much counter to *Sony* itself as to the long common-law tradition of fair use adjudication. Rather, as we explained in *Harper & Row*, *Sony* stands for the proposition that the "fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use." 471 U. S., at 562. But that is all, and the fact that even the force of that tendency will vary with the context is a further reason against elevating commerciality to hard presumptive significance. The use, for example, of a copyrighted work to advertise a product, even in a parody, will be entitled to less indulgence under the first factor of the fair use enquiry than the sale of a parody for its own sake, let alone one performed a single time by students in school. See generally Patry & Perlmutter 679–680; *Fisher* v. *Dees*, 794 F. 2d, at 437; *Maxtone-Graham* v. *Burtchaell*, 803 F. 2d 1253, 1262 (CA2 1986); *Sega Enterprises Ltd.* v. *Accolade, Inc.*, 977 F. 2d 1510, 1522 (CA9 1992).[18]

---

[18] Finally, regardless of the weight one might place on the alleged infringer's state of mind, compare *Harper & Row*, 471 U. S., at 562 (fair use presupposes good faith and fair dealing) (quotation marks omitted), with *Folsom* v. *Marsh*, 9 F. Cas. 342, 349 (No. 4,901) (CCD Mass. 1841) (good faith does not bar a finding of infringement); Leval 1126–1127 (good faith irrelevant to fair use analysis), we reject Acuff-Rose's argument that 2 Live Crew's request for permission to use the original should be weighed against a finding of fair use. Even if good faith were central to fair use, 2 Live Crew's actions do not necessarily suggest that they believed their version was not fair use; the offer may simply have been made in a good-faith effort to avoid this litigation. If the use is otherwise fair, then no permission need be sought or granted. Thus, being denied permission to use a work does not weigh against a finding of fair use. See *Fisher* v. *Dees*, 794 F. 2d 432, 437 (CA9 1986).

## B

The second statutory factor, "the nature of the copyrighted work," § 107(2), draws on Justice Story's expression, the "value of the materials used." *Folsom* v. *Marsh,* 9 F. Cas., at 348. This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied. See, *e. g., Stewart* v. *Abend,* 495 U. S., at 237–238 (contrasting fictional short story with factual works); *Harper & Row,* 471 U. S., at 563–564 (contrasting soon-to-be-published memoir with published speech); *Sony,* 464 U. S., at 455, n. 40 (contrasting motion pictures with news broadcasts); *Feist,* 499 U. S., at 348–351 (contrasting creative works with bare factual compilations); 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][2] (1993) (hereinafter Nimmer); Leval 1116. We agree with both the District Court and the Court of Appeals that the Orbison original's creative expression for public dissemination falls within the core of the copyright's protective purposes. 754 F. Supp., at 1155–1156; 972 F. 2d, at 1437. This fact, however, is not much help in this case, or ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works.

## C

The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," § 107(3) (or, in Justice Story's words, "the quantity and value of the materials used," *Folsom* v. *Marsh, supra,* at 348) are reasonable in relation to the purpose of the copying. Here, attention turns to the persuasiveness of a parodist's justification for the particular copying done, and the enquiry will harken back to the first of the statutory factors, for, as in prior cases, we recognize that the extent of permissible copying varies with the purpose and character

of the use.  See *Sony, supra,* at 449–450 (reproduction of entire work "does not have its ordinary effect of militating against a finding of fair use" as to home videotaping of television programs); *Harper & Row, supra,* at 564 ("[E]ven substantial quotations might qualify as fair use in a review of a published work or a news account of a speech" but not in a scoop of a soon-to-be-published memoir).  The facts bearing on this factor will also tend to address the fourth, by revealing the degree to which the parody may serve as a market substitute for the original or potentially licensed derivatives. See Leval 1123.

The District Court considered the song's parodic purpose in finding that 2 Live Crew had not helped themselves overmuch.  754 F. Supp., at 1156–1157.  The Court of Appeals disagreed, stating that "[w]hile it may not be inappropriate to find that no more was taken than necessary, the copying was qualitatively substantial. . . . We conclude that taking the heart of the original and making it the heart of a new work was to purloin a substantial portion of the essence of the original."  972 F. 2d, at 1438.

The Court of Appeals is of course correct that this factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too.  In *Harper & Row,* for example, the Nation had taken only some 300 words out of President Ford's memoirs, but we signaled the significance of the quotations in finding them to amount to "the heart of the book," the part most likely to be newsworthy and important in licensing serialization.  471 U. S., at 564–566, 568 (internal quotation marks omitted).  We also agree with the Court of Appeals that whether "a substantial portion of the infringing work was copied verbatim" from the copyrighted work is a relevant question, see *id.,* at 565, for it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth; a work composed primarily of an original, particularly its heart, with little added or changed,

is more likely to be a merely superseding use, fulfilling demand for the original.

Where we part company with the court below is in applying these guides to parody, and in particular to parody in the song before us. Parody presents a difficult case. Parody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation. Its art lies in the tension between a known original and its parodic twin. When parody takes aim at a particular original work, the parody must be able to "conjure up" at least enough of that original to make the object of its critical wit recognizable. See, e. g., Elsmere Music, 623 F. 2d, at 253, n. 1; Fisher v. Dees, 794 F. 2d, at 438–439. What makes for this recognition is quotation of the original's most distinctive or memorable features, which the parodist can be sure the audience will know. Once enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the song's overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original. But using some characteristic features cannot be avoided.

We think the Court of Appeals was insufficiently appreciative of parody's need for the recognizable sight or sound when it ruled 2 Live Crew's use unreasonable as a matter of law. It is true, of course, that 2 Live Crew copied the characteristic opening bass riff (or musical phrase) of the original, and true that the words of the first line copy the Orbison lyrics. But if quotation of the opening riff and the first line may be said to go to the "heart" of the original, the heart is also what most readily conjures up the song for parody, and it is the heart at which parody takes aim. Copying does not become excessive in relation to parodic purpose merely because the portion taken was the original's heart. If 2 Live Crew had copied a significantly less memorable part of the original, it is difficult to see how its parodic character

would have come through.   See *Fisher* v. *Dees, supra,* at 439.

This is not, of course, to say that anyone who calls himself a parodist can skim the cream and get away scot free.   In parody, as in news reporting, see *Harper & Row, supra,* context is everything, and the question of fairness asks what else the parodist did besides go to the heart of the original. It is significant that 2 Live Crew not only copied the first line of the original, but thereafter departed markedly from the Orbison lyrics for its own ends.   2 Live Crew not only copied the bass riff and repeated it,[19] but also produced otherwise distinctive sounds, interposing "scraper" noise, overlaying the music with solos in different keys, and altering the drum beat.   See 754 F. Supp., at 1155.   This is not a case, then, where "a substantial portion" of the parody itself is composed of a "verbatim" copying of the original.   It is not, that is, a case where the parody is so insubstantial, as compared to the copying, that the third factor must be resolved as a matter of law against the parodists.

Suffice it to say here that, as to the lyrics, we think the Court of Appeals correctly suggested that "no more was taken than necessary," 972 F. 2d, at 1438, but just for that reason, we fail to see how the copying can be excessive in relation to its parodic purpose, even if the portion taken is the original's "heart."   As to the music, we express no opinion whether repetition of the bass riff is excessive copying, and we remand to permit evaluation of the amount taken, in light of the song's parodic purpose and character, its transformative elements, and considerations of the potential for market substitution sketched more fully below.

---

[19] This may serve to heighten the comic effect of the parody, as one witness stated, App. 32a, Affidavit of Oscar Brand; see also *Elsmere Music, Inc.* v. *National Broadcasting Co.,* 482 F. Supp. 741, 747 (SDNY 1980) (repetition of "I Love Sodom"), or serve to dazzle with the original's music, as Acuff-Rose now contends.

## D

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." § 107(4). It requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original. Nimmer § 13.05[A][4], p. 13–102.61 (footnote omitted); accord, *Harper & Row*, 471 U. S., at 569; Senate Report, p. 65; *Folsom* v. *Marsh*, 9 F. Cas., at 349. The enquiry "must take account not only of harm to the original but also of harm to the market for derivative works." *Harper & Row, supra,* at 568.

Since fair use is an affirmative defense,[20] its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets.[21] In moving for summary judgment, 2 Live Crew left themselves at just such a disadvantage when they failed to address the effect on the market for rap derivatives, and confined themselves to uncontroverted submissions that there was no likely effect on the market for the original. They did not, however, thereby subject themselves to the evidentiary presumption applied by the Court of Appeals. In assessing the likelihood of significant market harm, the Court of Ap-

---

[20] *Harper & Row*, 471 U. S., at 561; H. R. Rep. No. 102–836, p. 3, n. 3 (1992).

[21] Even favorable evidence, without more, is no guarantee of fairness. Judge Leval gives the example of the film producer's appropriation of a composer's previously unknown song that turns the song into a commercial success; the boon to the song does not make the film's simple copying fair. Leval 1124, n. 84. This factor, no less than the other three, may be addressed only through a "sensitive balancing of interests." *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417, 455, n. 40 (1984). Market harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors.

peals quoted from language in *Sony* that "'[i]f the intended use is for commercial gain, that likelihood may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated.'" 972 F. 2d, at 1438, quoting *Sony*, 464 U. S., at 451. The court reasoned that because "the use of the copyrighted work is wholly commercial, . . . we presume that a likelihood of future harm to Acuff-Rose exists." 972 F. 2d, at 1438. In so doing, the court resolved the fourth factor against 2 Live Crew, just as it had the first, by applying a presumption about the effect of commercial use, a presumption which as applied here we hold to be error.

No "presumption" or inference of market harm that might find support in *Sony* is applicable to a case involving something beyond mere duplication for commercial purposes. *Sony*'s discussion of a presumption contrasts a context of verbatim copying of the original in its entirety for commercial purposes, with the noncommercial context of *Sony* itself (home copying of television programming). In the former circumstances, what *Sony* said simply makes common sense: when a commercial use amounts to mere duplication of the entirety of an original, it clearly "supersede[s] the objects," *Folsom* v. *Marsh, supra,* at 348, of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur. *Sony, supra,* at 451. But when, on the contrary, the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred. Indeed, as to parody pure and simple, it is more likely that the new work will not affect the market for the original in a way cognizable under this factor, that is, by acting as a substitute for it ("supersed[ing] [its] objects"). See Leval 1125; Patry & Perlmutter 692, 697–698. This is so because the parody and the original usually serve different market functions. Bisceglia, ASCAP, Copyright Law Symposium, No. 34, at 23.

We do not, of course, suggest that a parody may not harm the market at all, but when a lethal parody, like a scathing

theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act. Because "parody may quite legitimately aim at garroting the original, destroying it commercially as well as artistically," B. Kaplan, An Unhurried View of Copyright 69 (1967), the role of the courts is to distinguish between "[b]iting criticism [that merely] suppresses demand [and] copyright infringement[, which] usurps it." *Fisher* v. *Dees*, 794 F. 2d, at 438.

This distinction between potentially remediable displacement and unremediable disparagement is reflected in the rule that there is no protectible derivative market for criticism. The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop. Yet the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market. "People ask . . . for criticism, but they only want praise." S. Maugham, Of Human Bondage 241 (Penguin ed. 1992). Thus, to the extent that the opinion below may be read to have considered harm to the market for parodies of "Oh, Pretty Woman," see 972 F. 2d, at 1439, the court erred. Accord, *Fisher* v. *Dees, supra,* at 437; Leval 1125; Patry & Perlmutter 688–691.[22]

In explaining why the law recognizes no derivative market for critical works, including parody, we have, of course, been speaking of the later work as if it had nothing but a critical aspect (*i. e.,* "parody pure and simple," *supra,* at 591). But the later work may have a more complex character, with effects not only in the arena of criticism but also in protectible markets for derivative works, too. In that sort of case, the law looks beyond the criticism to the other elements of the work, as it does here. 2 Live Crew's song comprises not

---

[22] We express no opinion as to the derivative markets for works using elements of an original as vehicles for satire or amusement, making no comment on the original or criticism of it.

only parody but also rap music, and the derivative market for rap music is a proper focus of enquiry, see *Harper & Row, supra,* at 568; Nimmer § 13.05[B]. Evidence of substantial harm to it would weigh against a finding of fair use,[23] because the licensing of derivatives is an important economic incentive to the creation of originals. See 17 U. S. C. § 106(2) (copyright owner has rights to derivative works). Of course, the only harm to derivatives that need concern us, as discussed above, is the harm of market substitution. The fact that a parody may impair the market for derivative uses by the very effectiveness of its critical commentary is no more relevant under copyright than the like threat to the original market.[24]

Although 2 Live Crew submitted uncontroverted affidavits on the question of market harm to the original, neither they, nor Acuff-Rose, introduced evidence or affidavits addressing the likely effect of 2 Live Crew's parodic rap song on the market for a nonparody, rap version of "Oh, Pretty Woman." And while Acuff-Rose would have us find evidence of a rap market in the very facts that 2 Live Crew recorded a rap parody of "Oh, Pretty Woman" and another rap group sought a license to record a rap derivative, there was no evidence that a potential rap market was harmed in any way by 2 Live Crew's parody, rap version. The fact that 2 Live Crew's parody sold as part of a collection of rap songs says very little about the parody's effect on a market for a rap version of the original, either of the music alone or of the music with its lyrics. The District Court essentially passed

---

[23] See Nimmer § 13.05[A][4], p. 13–102.61 ("a substantially adverse impact on the potential market"); Leval 1125 ("reasonably substantial" harm); Patry & Perlmutter 697–698 (same).

[24] In some cases it may be difficult to determine whence the harm flows. In such cases, the other fair use factors may provide some indicia of the likely source of the harm. A work whose overriding purpose and character is parodic and whose borrowing is slight in relation to its parody will be far less likely to cause cognizable harm than a work with little parodic content and much copying.

on this issue, observing that Acuff-Rose is free to record "whatever version of the original it desires," 754 F. Supp., at 1158; the Court of Appeals went the other way by erroneous presumption. Contrary to each treatment, it is impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense, 2 Live Crew, to summary judgment. The evidentiary hole will doubtless be plugged on remand.

## III

It was error for the Court of Appeals to conclude that the commercial nature of 2 Live Crew's parody of "Oh, Pretty Woman" rendered it presumptively unfair. No such evidentiary presumption is available to address either the first factor, the character and purpose of the use, or the fourth, market harm, in determining whether a transformative use, such as parody, is a fair one. The court also erred in holding that 2 Live Crew had necessarily copied excessively from the Orbison original, considering the parodic purpose of the use. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

## APPENDIX A TO OPINION OF THE COURT

"Oh, Pretty Woman" by Roy Orbison and William Dees

Pretty Woman, walking down the street,
Pretty Woman, the kind I like to meet,
Pretty Woman, I don't believe you,
    you're not the truth,
No one could look as good as you
Mercy

Pretty Woman, won't you pardon me,
Pretty Woman, I couldn't help but see,

Pretty Woman, that you look lovely as can be
Are you lonely just like me?

Pretty Woman, stop a while,
Pretty Woman, talk a while,
Pretty Woman give your smile to me
Pretty Woman, yeah, yeah, yeah
Pretty Woman, look my way,
Pretty Woman, say you'll stay with me
'Cause I need you, I'll treat you right
Come to me baby, Be mine tonight

Pretty Woman, don't walk on by,
Pretty Woman, don't make me cry,
Pretty Woman, don't walk away,
Hey, O. K.
If that's the way it must be, O. K.
I guess I'll go on home, it's late
There'll be tomorrow night, but wait!

What do I see
Is she walking back to me?
Yeah, she's walking back to me!
Oh, Pretty Woman.

### APPENDIX B TO OPINION OF THE COURT

"Pretty Woman" as Recorded by 2 Live Crew

Pretty woman walkin' down the street
Pretty woman girl you look so sweet
Pretty woman you bring me down to that knee
Pretty woman you make me wanna beg please
Oh, pretty woman

Big hairy woman you need to shave that stuff
Big hairy woman you know I bet it's tough
Big hairy woman all that hair it ain't legit

'Cause you look like 'Cousin It'
Big hairy woman

Bald headed woman girl your hair won't grow
Bald headed woman you got a teeny weeny afro
Bald headed woman you know your hair could look
   nice
Bald headed woman first you got to roll it with rice
Bald headed woman here, let me get this hunk of
   biz for ya
Ya know what I'm saying you look better than rice
   a roni
Oh bald headed woman

Big hairy woman come on in
And don't forget your bald headed friend
Hey pretty woman let the boys
Jump in

Two timin' woman girl you know you ain't right
Two timin' woman you's out with my boy last night
Two timin' woman that takes a load off my mind
Two timin' woman now I know the baby ain't mine
Oh, two timin' woman
Oh pretty woman

JUSTICE KENNEDY, concurring.

I agree that remand is appropriate and join the opinion of
the Court, with these further observations about the fair use
analysis of parody.

The common-law method instated by the fair use provision
of the copyright statute, 17 U. S. C. § 107 (1988 ed. and Supp.
IV), presumes that rules will emerge from the course of deci-
sions. I agree that certain general principles are now dis-
cernible to define the fair use exception for parody. One of
these rules, as the Court observes, is that parody may qual-
ify as fair use regardless of whether it is published or per-

formed for profit. *Ante*, at 591. Another is that parody may qualify as fair use only if it draws upon the original composition to make humorous or ironic commentary about that same composition. *Ante*, at 580. It is not enough that the parody use the original in a humorous fashion, however creative that humor may be. The parody must target the original, and not just its general style, the genre of art to which it belongs, or society as a whole (although if it targets the original, it may target those features as well). See *Rogers* v. *Koons*, 960 F. 2d 301, 310 (CA2 1992) ("[T]hough the satire need not be only of the copied work and may . . . also be a parody of modern society, the copied work must be, at least in part, an object of the parody"); *Fisher* v. *Dees*, 794 F. 2d 432, 436 (CA9 1986) ("[A] humorous or satiric work deserves protection under the fair-use doctrine only if the copied work is at least partly the target of the work in question"). This prerequisite confines fair use protection to works whose very subject is the original composition and so necessitates some borrowing from it. See *MCA, Inc.* v. *Wilson*, 677 F. 2d 180, 185 (CA2 1981) ("[I]f the copyrighted song is not at least in part an object of the parody, there is no need to conjure it up"); Bisceglia, Parody and Copyright Protection: Turning the Balancing Act Into a Juggling Act, in ASCAP, Copyright Law Symposium, No. 34, pp. 23–29 (1987). It also protects works we have reason to fear will not be licensed by copyright holders who wish to shield their works from criticism. See *Fisher, supra*, at 437 ("Self-esteem is seldom strong enough to permit the granting of permission even in exchange for a reasonable fee"); Posner, When Is Parody Fair Use?, 21 J. Legal Studies 67, 73 (1992) ("There is an obstruction when the parodied work is a target of the parodist's criticism, for it may be in the private interest of the copyright owner, but not in the social interest, to suppress criticism of the work") (emphasis deleted).

If we keep the definition of parody within these limits, we have gone most of the way towards satisfying the four-factor

fair use test in § 107. The first factor (the purpose and character of use) itself concerns the definition of parody. The second factor (the nature of the copyrighted work) adds little to the first, since "parodies almost invariably copy publicly known, expressive works." *Ante,* at 586. The third factor (the amount and substantiality of the portion used in relation to the whole) is likewise subsumed within the definition of parody. In determining whether an alleged parody has taken too much, the target of the parody is what gives content to the inquiry. Some parodies, by their nature, require substantial copying. See *Elsmere Music, Inc.* v. *National Broadcasting Co.,* 623 F. 2d 252 (CA2 1980) (holding that "I Love Sodom" skit on "Saturday Night Live" is legitimate parody of the "I Love New York" campaign). Other parodies, like Lewis Carroll's "You Are Old, Father William," need only take parts of the original composition. The third factor does reinforce the principle that courts should not accord fair use protection to profiteers who do no more than add a few silly words to someone else's song or place the characters from a familiar work in novel or eccentric poses. See, *e. g., Walt Disney Productions* v. *Air Pirates,* 581 F. 2d 751 (CA9 1978); *DC Comics Inc.* v. *Unlimited Monkey Business, Inc.,* 598 F. Supp. 110 (ND Ga. 1984). But, as I believe the Court acknowledges, *ante,* at 588–589, it is by no means a test of mechanical application. In my view, it serves in effect to ensure compliance with the targeting requirement.

As to the fourth factor (the effect of the use on the market for the original), the Court acknowledges that it is legitimate for parody to suppress demand for the original by its critical effect. *Ante,* at 591–592. What it may not do is usurp demand by its substitutive effect. *Ibid.* It will be difficult, of course, for courts to determine whether harm to the market results from a parody's critical or substitutive effects. But again, if we keep the definition of parody within appropriate bounds, this inquiry may be of little significance. If a work targets another for humorous or ironic effect, it is by defini-

tion a new creative work. Creative works can compete with other creative works for the same market, even if their appeal is overlapping. Factor four thus underscores the importance of ensuring that the parody is in fact an independent creative work, which is why the parody must "make some critical comment or statement about the original work which reflects the original perspective of the parodist—thereby giving the parody social value beyond its entertainment function." *Metro-Goldwyn-Mayer, Inc.* v. *Showcase Atlanta Cooperative Productions, Inc.*, 479 F. Supp. 351, 357 (ND Ga. 1979).

The fair use factors thus reinforce the importance of keeping the definition of parody within proper limits. More than arguable parodic content should be required to deem a would-be parody a fair use. Fair use is an affirmative defense, so doubts about whether a given use is fair should not be resolved in favor of the self-proclaimed parodist. We should not make it easy for musicians to exploit existing works and then later claim that their rendition was a valuable commentary on the original. Almost any revamped modern version of a familiar composition can be construed as a "comment on the naiveté of the original," *ante*, at 583, because of the difference in style and because it will be amusing to hear how the old tune sounds in the new genre. Just the thought of a rap version of Beethoven's Fifth Symphony or "Achy Breaky Heart" is bound to make people smile. If we allow any weak transformation to qualify as parody, however, we weaken the protection of copyright. And underprotection of copyright disserves the goals of copyright just as much as overprotection, by reducing the financial incentive to create.

The Court decides it is "fair to say that 2 Live Crew's song reasonably could be perceived as commenting on the original or criticizing it, to some degree." *Ibid.* (applying the first fair use factor). While I am not so assured that 2 Live Crew's song is a legitimate parody, the Court's treatment of

the remaining factors leaves room for the District Court to determine on remand that the song is not a fair use. As future courts apply our fair use analysis, they must take care to ensure that not just any commercial takeoff is rationalized *post hoc* as a parody.

With these observations, I join the opinion of the Court.