**STORM IMPACT, INC., an Illinois Corporation, and David Alan Cook, Plaintiffs,**

v.

**SOFTWARE OF THE MONTH CLUB, Defendant.**

**No. 95 C 2154.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 29, 1998.

William R. McGrath, John B. Alsterda, Davis, Mannix & McGrath, Chicago, IL, for plaintiffs.

Burton S. Ehrlich, Brezina and Ehrlich, Chicago, IL, John C. Brezina, Brezina & Ehrlich, Oak Brook, IL, for defendant.

### *Memorandum Opinion and Order*

ZAGEL, District Judge.

Storm Impact and David Cook (collectively "Storm") have sued Software of the Month Club ("SOMC") for copyright infringement (Count I), unfair competition and false designation of origin under § 43 of the Lanham Act (Count II), and deceptive trade practices under the Illinois Consumer Fraud Deceptive Business Practices Act, 815 ILCS 505/2 and 510/2 (Count III). On September 8, 1997, I denied summary judgment for both parties on the copyright infringement claim. I found that material issues of fact existed as to whether SOMC's use of Storm's computer programs, MacSki and TaskMaker, fell within the fair use doctrine and what, if any, damages Storm incurred. After more fully developing the record in a bench trial, I now find that SOMC's copying and distribution of Storm's products did not constitute fair use and that SOMC has infringed Storm's copyrights and grant Storm $20,000 in statutory damages for its copyright infringement claims.

Storm Impact is an Illinois corporation with an office in Glenview. Its owner is David Alan Cook. Dan Schwimmer worked with plaintiffs designing levels and courses for the games TaskMaker and MacSki which were developed (beginning in 1989) by Cook, Schwimmer and Thomas Zehner (artwork). They produced software and shareware. Cook copyrighted TaskMaker and MacSki and listed himself as sole author.[1]

In October, 1993, Storm Impact began selling an upgraded version of TaskMaker "v.2.0." One of the marketing tactics Storm Impact used was to distribute the software as "shareware." Shareware is not a kind of software, it is a way of marketing software as an alternative to retail selling; it is much cheaper than conventional retail methods.

The federal government has defined shareware as "copyrighted software which is distributed for the purposes of testing and review, subject to the condition that payment to the copyright owner is required after a person who has secured a copy decides to use the software." 37 C.F.R. § 201.26. Shareware gives the user an opportunity to use the product and try it out before buying it.

There are two common forms of shareware. With the first, the owner of the software makes the complete software available to users without charge for the purpose of evaluation. If users wish to keep the software after a trial basis, they must forward a registration fee to the owner. Shareware programs distributed in this manner rely to a large extent on the honesty of the users. The second form of shareware contains the computer equivalent of a lock on part of the program. The "lock" is a feature built into the software program which disables portions of the program. The user can sample the unlocked portion at no charge, and, if the user likes what he sees, he can buy the "key" in the form of a floppy disk and registration number which enables the user to use the whole program. Storm Impact used this second form of shareware to market TaskMaker.

In September 1994, Storm Impact started selling an upgraded version of MacSki "v.1.5." The MacSki game contained a number of ski runs. The shareware version stopped the user halfway down the ski run. If the user wanted to play the full game, he could register with Storm Impact to purchase the "key." Storm Impact made both TaskMaker and MacSki available on America Online.

Shareware programs typically display a legend that expressly permits the user to try the software before buying it and encourages the user to give unaltered and complete copies of the software to friends, family and associates. The legend customarily contains an express restriction that one cannot charge for copies or try to make a profit from the software or its distribution. The restrictions typically forbid commercial distribution, of the software, mass distribution, or its sale for a profit.

Both TaskMaker and MacSki contain express restrictions which appear on their respective screen displays. The TaskMaker restriction states:

> Copy this game! Give copies to your friends, family, and associates.... If you like this game, and want to see more, make an effort to give a copy to everyone you know. Remember—copies must be unaltered and complete.... Don't charge for copies or try to make a profit from Task-Maker® or its distribution. See the Legal section of this text for details.

The MacSki restriction states:

> Copy this game! Give copies to your friends, family, and associates.... But remember—copies must be unaltered and complete. Make sure to include the sound, color, and course files with the application. Don't charge for copies or distribution. Read the Legal section of this text for restrictions.

The Legal section for both games state:

> Commercial distribution prohibited, as is distribution in exchange for compensation or any other consideration, except that acquisition of download time in exchange for uploading this program onto electronic bul-

---

1. There is an immaterial dispute as to whether Cook was author or co-author and whether he should have listed Schwimmer and Zehner who, in any event, assigned their rights to Cook.

letin boards is allowed. De minimis actual costs incurred in distribution, such as disks and postage, may be recouped. Mass duplication and distribution prohibited, except for uploading to electronic bulletin boards, and then only when no consideration passes except for free download time.

In addition, the MacSki game has an express prohibition against copying the program on CD–ROM, under any circumstances, and further defines mass duplication as "50 or more copies in any 12 month period."

Software of the Month Club is a California corporation with an office in Carlsbad, California. SOMC provides collections of newly introduced shareware to its customers on a monthly basis. SOMC charges an initial fee of $39.95 to become a member. Thereafter, members pay a monthly fee of $24.95 to retain the service and receive a disk or CD–ROM each month.

SOMC has employees scour the online universe for what it thinks is the "latest and greatest" shareware and receives shareware directly at its own website from those who wish to have their products considered for selection by SOMC. SOMC employees then screen through the number of different shareware programs each month and assemble the "best" shareware programs into categories by subject matter, i.e., educational, business, games, etc. About 25% of what is examined makes it to the final volume which is then distributed to customers on a monthly basis, but sometimes more frequently. SOMC has 60,000 members and in 1993/94 had about 30,000 members. SOMC sends literature to its customers that recommends that users register with the authors whose work they enjoy.

All of this costs money. SOMC is in business to make profits (and it does) from its labors of searching for and testing shareware and its use of its critical judgment of the popular merits of the shareware. It gets fees from its members and, perhaps, fees from software makers who sell their products through SOMC distribution.

SOMC says it performs a service to authors. Storm Impact wrongly disputes this assertion. SOMC clearly does provide a service, it endorses and distributes the works of authors.[2] What Storm Impact means to say is that it does not want the service because it might alienate potential customers, injure its reputation and result in customers being given erroneous technical advice.[3] Storm Impact believes that *free* shareware is a good distribution technique and does not want to participate in an enterprise where a fee is charged in connection with shareware distribution.

It has been SOMC's policy not to use shareware if it has the restrictions seen on plaintiffs' shareware. Yet, a SOMC employee believed (at a prior time) that if something was shareware, then permission to reproduce was implied. And, before this lawsuit there was a mixed-bag practice of seeking permission to use an author's work at some times and not at others. Apparently, no one at SOMC either read or paid attention to the express restrictions that were on TaskMaker or MacSki, and they never received express permission to put them on SOMC disks. Since the filing of this lawsuit, SOMC now asks all authors for written permission to reproduce their shareware unless the work itself contains permission to reproduce.

The purpose of copyright protection, in the words of the Constitution, is to "promote the Progress of Science and useful Arts." *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 477, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Copyright is based on the belief that by granting authors the exclusive rights to reproduce their works, they are given an incentive to create, and that "encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors." *Id.* However, for progress to occur, others must be permitted to build upon

---

**2.** In contrast to a "shovelware" CD–ROM which collects hundreds of programs, new or old, without evaluation of their merits.

**3.** SOMC says it offers technical advice only on how to use the disk it provides. Storm Impact says it has evidence that SOMC gives erroneous advice on the operation of the MacSki® color files.

and refer to the creations of prior thinkers. Thus, there is an inherent tension in the need to protect copyrighted material and to allow others to build upon it. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

■ One device for resolving this tension is the fair use doctrine which creates an exception to the copyright monopoly. The defense of fair use carves out of the exclusive rights conferred by the Copyright Act, and legally empowers a person to use the copyrighted works in a reasonable manner without the consent of the copyright owner. The fair use doctrine requires courts to avoid the rigid application of the copyright statute when it would stifle the very creativity the law is designed to foster. *Campbell*, 510 U.S. at 577, 114 S.Ct. 1164.

Fair use allows a second author to make certain uses of the first author's work for the public good. *Sony*, 464 U.S. at 478, 104 S.Ct. 774. The uses which are deemed fair have a common theme, each is a productive use, resulting in some added benefit to the public beyond that produced by the first author's work. *Id.* As courts have said, the fair use doctrine strikes a balance between the dual risks created by the copyright system: on the one hand, that depriving authors of their monopoly will reduce their incentive to create, and, on the other, that granting authors a complete monopoly will reduce the creative ability of others. *Id.* at 479, 104 S.Ct. 774.

This rule was made by judges without benefit of statute until the doctrine was codified at Section 107 of the Copyright Act. This statute does not supersede the common law tradition of fair use. Rather, Section 107 was intended only to restate (and approve) the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way. *Campbell*, 510 U.S. at 577, 114 S.Ct. 1164. Section 107 states as follows:

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

■ The four fair use factors are illustrative and not exhaustive. They are not to be treated in isolation, but are to be explored and the results weighed together, in light of the purposes of copyright on a case-by-case basis. *Campbell*, 510 U.S. at 577–78, 114 S.Ct. 1164.

■ SOMC does not contest that its use of plaintiffs' shareware constitutes an infringement of Storm Impact and Cook's rights in MacSki and TaskMaker under Section 106 of the Copyright Act, but for a finding of fair use.

■ The first factor in a fair use enquiry is "the purpose and character of the use, including whether such a use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This factor directs the courts to examine whether the particular use made of copyrighted material was necessary to the asserted purpose, or whether the defendant's purpose could have been accomplished by taking nonprotectible material or less expression. William F. Patry, *The Fair Use Privilege in Copyright Law*, 2d ed. p. 418–19. In balancing the inquiry, courts should examine whether the defendant reproduced the copyright owner's expression for the purpose of marketing the precise form of that expression or for the purpose of making his own additional statement. *Id.* at 425.

There are two aspects to this test, (1) the degree to which the challenged use has transformed the original, and (2) the profit or nonprofit character of the use. Analysis here centers on whether the new work merely "supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative." *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164 (internal quotations and citations omitted). Works that are transformative are more likely to promote science and the arts, whereas works that merely copy the original are likely to be found to be infringements of the copyrighted work. Such transformative use is not absolutely necessary for a finding of fair use; however, the more transformative the new work, the less will be the significance of other factors which may weigh against a finding of fair use. *Id.*

SOMC argues that shareware per-se, and its use of TaskMaker and MacSki, are transformative and therefore within the fair use doctrine. Both of these theories shareware version of a copyrighted computer program is not transformative within the meaning of fair use. Storm, not SOMC, affected the changes that exist between the original versions and the shareware versions of the two programs. Transformation in the fair use context anticipates transformation by the user, not the copyright holder. *See generally Campbell,* 510 U.S. at 578–79, 114 S.Ct. 1164 (1994) (explaining that transformation in the fair use contexts requires adding something new with a further purpose and different character, and implying that this change be made by the party claiming the fair use defense). Shareware can not be per se transformative because the copyright holder, Storm in this case, limits the program's scope by changing its coding. The user, who claims that the work has been transformed, has done nothing.

Furthermore, SOMC's modifications to Storm's programs do not sufficiently change MacSki and TaskMaker to constitute a transformation. SOMC says that it has trans-

formed the programs at substantial expense to itself when it reviewed them and when it included them in its distribution. However, SOMC does not deny that it copied Storm's products, in their copyrighted shareware version, line for line. SOMC's copies served the same purpose that Storm's originals did. SOMC merely delivered the shareware more efficiently. Such mechanical transformation is not fair use. *See Princeton University Press,* 99 F.3d at 1389.

In making its transformation analysis, SOMC compares its use of Storm's shareware to a book review. This analogy also fails. If Storm had simply provided its customers with reviews of new shareware and showed pictures of the games, then the use would be sufficiently analogous to a book review to be transformative. I find, however, that because SOMC copied Storm's products and distributed them for the same purpose Storm designed them, it did not transform TaskMaker and MacSki within the meaning of fair use.

The other element of the first fair use factor is whether SOMC's use of the copyrighted material is of a commercial nature or is for nonprofit educational purposes. This factor does not establish an either/or choice with commercial uses banished and nonprofit educational uses allowed. The central inquiry "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). It is difficult to classify any particular use as either commercial or noncommercial as few uses will qualify as purely one or the other. Most involve some degree of monetary gain, whether direct or indirect.

SOMC argues that its use is not commercial, rather it claims it is providing a service to both the customer and the author by providing a larger market for the ultimate sale of the author's software and a service to the customer to weed through all the shareware that exists. SOMC claims the fact that it makes money from the sale of its monthly service does not transform its service into a

commercial use since every business makes money.

SOMC is in the business of selling the ability to try out the "latest and greatest" computer programs without having to pay the full price for the program until the customer knows he actually wants to purchase it. SOMC could not be successful in this endeavor if it did not market what it finds to be the best shareware each month. Task-Maker was a featured game selection one month. It is clear that SOMC's commercial success is dependant upon featuring Cook's and other authors' shareware as SOMC captures revenues as a direct consequence of copying the original work. However, the shareware versions of MacSki and TaskMaker are available online for free. There is no customary price for the shareware versions which SOMC distributes to its customers. Thus, it cannot be said that SOMC is profiting from the exploitation of the copyrighted material without paying the customary price. *Harper & Row,* 471 U.S. at 562, 105 S.Ct. 2218. Therefore, I find the commercial nature of SOMC's use does not favor either side.

■ The second factor in the analysis requires the court to examine "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor recognizes that fair use is more difficult to establish when the work being used is at the core of intended copyright protection. *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. Creative and original works are accorded greater protection than factual works. Thus, fair use is more difficult to establish when creative works are copied. *Id.*

Storm Impact and Cook's works are computer games, original and creative works. They are not facts or news. This weighs in favor of plaintiffs.

■ The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). When "a substantial portion of the infringing work [i]s copied verbatim, [it evidences] the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to

profit from marketing someone else's copyrighted expression." *Harper & Row,* 471 U.S. at 565, 105 S.Ct. 2218. However, the extent of permissible copying varies with the purpose and character of the use. *Campbell,* 510 U.S. at 586–87, 114 S.Ct. 1164. Thus, the court must look to whether the quantity and value of the materials used are reasonable in relation to the purpose of copying. *Id.*

> [W]hether a substantial portion of the infringing work [i]s copied verbatim from the copyrighted work is a relevant question for it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth; a work composed primarily of an original, ... with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original.

*Id.* at 1175–76, 114 S.Ct. 1164 (internal citation omitted).

■ The fourth fair use factor looks to "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Under this concept, courts must consider the extent of market harm caused by the particular actions of the alleged infringer and whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original. *Campbell,* 510 U.S. at 590, 114 S.Ct. 1164. This inquiry must take account of the harm to the market for derivative works as well as the harm to the original. *Id.* The Court in *Harper & Row* described this last factor as the single most important element of fair use. *Harper & Row,* 471 U.S. at 566, 105 S.Ct. 2218. "Fair use ... is limited to copying by others which does not materially impair the marketability of the work which is copied." *Id.* at 566–67, 105 S.Ct. 2218, citing, 1 Nimmer § 1.10[D], at 1–87.

SOMC asserts that there is no negative effect upon the potential market for the copyrighted work, but a benefit to both plaintiffs and the public. SOMC claims plaintiffs are benefitted because their sales of the complete software have been greatly enhanced

based on the wide distribution of the shareware versions. SOMC also claims the public has benefitted as the software market has enhanced access to the best shareware that is available. This argument that increased distribution of an author's work is a benefit to the author has been rejected by the Supreme Court. In *Harper & Row* the Court stated, "[a]ny copyright infringer may claim to benefit the public by increasing public access to the copyrighted work.... But Congress has not designed, and we see no warrant for judicially imposing, a 'compulsory license' ..." to copyrighted works. *Harper & Row*, 471 U.S. at 569, 105 S.Ct. 2218 (internal citation omitted).

Storm Impact and Cook claim that the inclusion of MacSki and TaskMaker among SOMC's mailings has created ill will among potential customers and has interfered with their carefully planned method of distributing MacSki and TaskMaker. Plaintiffs claim they have received numerous complaints from persons who are upset that they have to register and pay them to obtain the "key" after they have already made numerous payments to SOMC. SOMC disputes that any complaints have been made. SOMC claims that customers who use shareware know what it is, that you try before you buy, and cannot possibly believe that they have already paid for the complete software program when they only receive the shareware version. Further, SOMC argues customers are informed when they sign up with SOMC that they are not receiving the complete software program, but are informed that if they like the shareware they may then purchase the "key" from the author.

In order to understand the effect SOMC has had on plaintiffs' work, it is necessary to understand the custom and practice of the shareware market. On the one hand, shareware creators generally give their product away for free and encourage users to give free copies to everyone they know. At the same time however, shareware creators put restrictions on their products telling users not to sell, mass distribute or charge for copies.

It is also necessary to understand how SOMC fits in within the "of the month club" industry. There seems to be an infinite number of "month clubs," to name only a few: "Book of the Month Club," "Beer of the Month Club," "CD of the Month Club," "Knucklehead of the Month Club," "Fruit of the Month Club," etc. Plaintiffs apparently analogize SOMC to the Book of the Month Club or CD of the Month Club where the customer pays each month to receive a new and complete version of a book or CD. But SOMC is different because it is the free sample of the month club. SOMC's service might be analogized to a newspaper containing movie reviews where a customer buys the paper to read the reviews and see what is playing, but knows she will have to pay again to see the movie. SOMC claims customers know what they are getting and they do not believe they are paying twice to obtain plaintiffs' software.

■ The effect of SOMC's distribution on Storm's market turns on whether its members knew that they would have to pay more for the full version of Storm's products, whether SOMC gave its consumers bad technical support advice about TaskMaker and MacSki, and whether either of these factors, if true, adversely affected Storm's future distribution plans. In applying this fourth factor, I note that for profit defendants, like SOMC, have the burden to show that their conduct falls within fair use. *See Princeton Univ. Press v. Michigan Doc. Services Inc.*, 99 F.3d 1381, 1386 (6th Cir.1996). The evidence Storm adduced at trial supports Storm's contention that SOMC's use of the software angered some consumers, that SOMC provided improper technical support, and that SOMC's fee reduced the chance that customers would register with Storm. Therefore, I find that SOMC's use of Storm's product adversely affected the market for Storm's programs and that the fourth factor militates against a finding of fair use.

■ In its defense, SOMC says that because Storm posted its shareware product on the Internet for non-commercial distribution, any reservation of its rights with regard to commercial distribution failed. By publishing its shareware, SOMC says that Storm impliedly consented to SOMC's distribution. To find otherwise, argues SOMC, would be to

subject shareware to unreasonable restrictions defeating the purpose for which it was intended.

Storm, in turn, notes that in other contexts, courts have found copyright infringement where materials have been posted on the Internet. See, e.g., *Marobie–Fl, Inc. v. Nat'l Ass'n of Fire and Equip. Distributors and Northwest Nexus, Inc.,* 983 F.Supp. 1167 (N.D.Ill.1997); *Playboy Enterprises, Inc. v. Frena,* 839 F.Supp. 1552 ˙(M.D.Fla.1993); *Playboy Enterprises, Inc. v. Webbworld, Inc.,* 968 F.Supp. 1171 (N.D.Tex.1997); *Sega Enterprises Ltd. v. MAPHIA,* 857 F.Supp. 679 (N.D.Cal.1994). In none of these cases, however, did the copyright holder place the material on the Internet, allow limited distribution for free, and attempt to restrict this free distribution to non-commercial use. Protecting material placed on the Internet for free distribution appears to be a question of first impression.

I find that TaskMaker and MacSki's express reservations of distribution rights are valid, enforceable, and militate against a finding of fair use. In making this determination, given the lack of statutory guidance and topical case law, I turn to SOMC's expert, James Sprowl. Sprowl agrees that the public does not benefit when shareware is distributed in violation of its express restrictions. SOMC unquestionably violated the express restrictions of both TaskMaker and MacSki, eviscerating any claim that Storm effectively consented to unlimited distribution of its products by posting them on the Internet.

### Count II: Trademark Infringement & Count III: Unfair Consumer Practices

Storm claims that SOMC violated § 43(a) of the Lanham Act and the Illinois Consumer Fraud and Deceptive Business Practices Act because SOMC's use of Storm's trademarks on TaskMaker and MacSki falsely designated the products' origin. Storm says that SOMC misled consumers when it used the name Storm Impact, TaskMaker, and MacSki on SOMC's compilations and in its promotional materials. The parties have not fully briefed these issues and I do not reach their merits here. If Storm wishes to pursue them, I will grant a briefing schedule.

### Damages

Storm requests the greater of actual or statutory damages for its copyright claim. Section 504(b) provides that Storm is entitled to recover actual damages as a result of SOMC's infringement and any of SOMC's profits attributable to the infringement not included in computing the actual damages. 17 U.S.C. § 504(b). Neither the copyright act nor its legislative history expressly delineates the meaning of the term actual damages, leaving the guidelines for the actual damage computation poorly defined. *See Joseph J. Legat Architects, P.C. v. United States Development Corp.,* 1991 WL 38714, *5 (N.D.Ill.).

▮ In calculating actual damages Storm requests that I consider the value of the SOMC's use of Storm's programs. This method of calculating damages appears to be limited to instances in which statutory damages and other methods of calculating actual damages are unavailable. *See generally Deltak, Inc. v. Advanced Systems, Inc.,* 767 F.2d 357 (7th Cir.1985). Actual damages, however limited, and statutory damages are available to Storm. This makes a value of the infringer's use calculation unnecessary and inappropriate in this context.[4]

Storm may recover profits to SOMC from its use of Storm's product. Storm calculates the profit SOMC made from distribution of MacSki and TaskMaker to be $4,845, and SOMC calculates them at $241. In calculating Storm's damages, I must show it sub-

---

4. Even if infringer's use applied, Storm's pricing grossly overestimates the fair market value of its shareware. *See Deltak, Inc.,* 767 F.2d at 363 (holding that the value of use approach requires the court to determine the fair market value of the infringed product and that list price is not necessarily conclusive). Storm provides insufficient evidence that a shareware distributor paid or would pay $18 for the right to distribute

Storm's crippled programs. A monthly subscription to SOMC costs $25 and contains either 7 or 130 games (depending on whether floppy disks or CD ROMs were used). For this reason alone an $18 per unit cost does not accurately reflect the market for Storm's otherwise free software. I do not actually reach a value of the cost per unit for Storm's shareware, but note that its value is substantially lower than $18.

stantial liberality of proof. *Deltak,* 767 F.2d at 363.

I find Storm's method of calculating SOMC's profits from Storm's programs acceptable with one caveat.[5] SOMC points out that many of its customers could not use the MacSki software because they only owned or used IBM machines. Therefore, if Storm had elected actual damages, I would award it the amount produced by its formula, $4,845, minus the profits attributable to DOS or Windows customers who received, but could not use, MacSki. See generally, *Deltak,* 767 F.2d at 364 (noting that district court multiplied the cost per copy by the number of copies that were actually sold, not merely copied by the infringer). Here, although, these MacSki programs were sold, the consumer presumably had no use for them given the program's incompatibility with a non-Apple platform. Therefore, I find it reasonable to assume that these consumers bought SOMC's compilation for the DOS/Windows compatible programs and not for MacSki.

Pursuant to § 504(c), Storm may elect statutory damages at any time prior to final judgment. Without a finding of willful infringement, these damages may range from $500 to $20,000 for each program; if SOMC's actions were willful, the statutory maximum is $100,000. I have broad discretion in awarding statutory damages, and the damages need not be based on Storm's losses. *Chi–Boy Music v. Charlie Club, Inc.,* 930 F.2d 1224, 1229–30 (7th Cir.1991).

I now find that SOMC did not willfully infringe Storm's copyrights. This case was an issue of first impression, and SOMC has made a plausible, although ultimately unconvincing, case that Storm's release of the free software indicated its implied consent and that the remaining restrictions on the shareware's use were unenforceable. Furthermore, once notified that Storm did not consent, SOMC removed MacSki and TaskMaker from its monthly compilations. These actions outweigh SOMC's sloppy practices in getting software manufacturers' permission before using their products and mandate, in my view of the facts, a finding of non-willfulness.

This does not mean, however, that the statutory damage award against SOMC should be minimal. Storm has hard to prove damages in business goodwill stemming from SOMC's use of its products, and without sophisticated consumer sampling (impractical here) it is impossible to know exactly how much of SOMC's profits are due to Storm's product. Therefore I award Storm $10,000 per infringement, for a total of $20,000 in statutory damages. Because my award of statutory damages is greater than my award of actual damages, I consider Storm to have elected statutory damages.

In its defense against damages, SOMC says that Storm delayed in notifying it and that Storm attempted to entrap SOMC by adding a no–CD–Rom restriction. SOMC says that Storm knew of SOMC's use of TaskMaker in November 1993, but Storm failed to bring suit until after SOMC distributed MacSki on CD–Rom in November 1995. Storm says that it was simply being prudent in understanding the nature of SOMC's use of its products and that it sent a cease and desist letter in January 1995, a month after becoming aware of the inclusion of TaskMaker. I find Storm's delay in bringing suit reasonable and find no evidence that it tried to entrap SOMC with MacSki's CD–Rom restriction.

### Conclusion

I find for Storm on Count I, copyright infringement, and award it $20,000 total in statutory damages—$10,000 per infringement. I withhold decision on Counts II & III, the false origin claims and Storm's request for attorney's fees, pending briefing.

---

5. In calculating SOMC's profits, Storm used the following formula: (number of disks including Storm's programs) × (the amount of SOMC's monthly subscription) / (the number of programs on the disks) = [total] − (the average cost of reproduction).