IMAGES AUDIO VISUAL PRODUCTIONS, INC., Plaintiff,

v.

PERINI BUILDING COMPANY, INC., Defendant.

No. 99–73855.

United States District Court, E.D. Michigan, Southern Division.

April 12, 2000.

---

Gary Quesada, Bloomfield Hills, MI, for plaintiff.

Steven A. Roach, Detroit, MI, for defendant.

## OPINION AND ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

On August 3, 1999, Plaintiff Images Audio Visual Productions, Inc., a Michigan corporation, brought suit in this Court against Defendant Perini Building Company, Inc., a Massachusetts corporation with offices in Detroit, Michigan, asserting copyright infringement and breach of contract claims arising from Defendant's reproduction of photographs taken by Plaintiff's sole owner, Robert Rentschler. This Court has subject matter jurisdiction under 28 U.S.C. § 1338(a) and 28 U.S.C. § 1367(a).

The operative facts of this case are straightforward. Defendant engaged Plaintiff to take photographs of Defendant's construction work at the Soaring Eagle Casino and Resort in Mount Pleasant, Michigan. Defendant subsequently commenced an arbitration proceeding seeking payment for its construction services, and approached Plaintiff to obtain additional copies of the construction photos

for use as exhibits. When Plaintiff responded with a price quote that Defendant deemed excessive, Defendant turned instead to a local copying service to produce color photocopies of the prints in its possession. Upon learning of this, Plaintiff brought the present action.

By motions filed on January 3, 2000 and on December 29, 1999, respectively, both Plaintiff and Defendant seek summary judgment in their favor. Each party has responded to the other's motion, and Defendant has filed a reply in further support of its motion. On March 30, 2000, the Court heard argument on these cross-motions.

The parties' motions present an interesting copyright question that has gone largely unaddressed in the case law: namely, whether a litigant may invoke the "fair use" doctrine to reproduce copyrighted materials for use as exhibits in judicial or quasi-judicial proceedings without first securing the permission of the copyright holder. As discussed below, the Court answers this question in the negative under the particular facts of this case, where litigation was one of the contemplated uses of the copyrighted photos at issue. Consequently, Plaintiff is entitled to partial summary judgment in its favor on the issue of copyright infringement.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

As noted earlier, the facts of this case are straightforward, and almost entirely undisputed. Plaintiff Images Audio Visual Productions and its principal, Robert Rentschler, are engaged in the business of commercial photography, including construction photography. Defendant Perini Building Company is a construction firm.

In 1995, the Saginaw Chippewa Tribe of Michigan hired Defendant to construct the Soaring Eagle Casino and Resort complex in Mount Pleasant, Michigan. As is customary in the construction industry, Defendant sought to document its progress on this project by retaining the services of a commercial photographer. The parties agree that one important purpose of construction photographs is as an evidentiary record of progress in the event that a dispute arises during or after construction.

Accordingly, in early October of 1995, Defendant's project manager, Debbie Anderson, contacted Plaintiff about taking aerial photos of the construction site. Plaintiff responded with an October 3, 1995 memorandum setting forth the proposed terms of the parties' relationship:

> The cost to fly from Flint Bishop airport to Mt. Pleasant, shoot the job site and return to Flint is $165.00. The photography fee for this flight is $145.00, this includes photographer, film, processing, proofs, photo album and delivery. The cost for 8 × 10 inch photographs is $18.00 each with title block or $15.00 each no title block, delivered. Turn around time from date of order placement is one week. Delivery of proofs from date of photography is four days. All items are subject to 6% Michigan sales tax except the $165.00 for the airplane. I will be glad to quote you an exact price once you determine the frequency of flights needed and the number of prints needed per view. Other print sizes are available please call for a quote.

(Defendant's Motion, Ex. D.) That same day, Ms. Anderson returned this memo to Plaintiff, with a handwritten note indicating Defendant's agreement to these terms and its desire to schedule the first series of aerial photos as soon as possible. (*Id.*)

The parties subsequently restated the terms of Plaintiff's memo in an October 30, 1995 purchase order signed by Mr. Rentschler. (Plaintiff's Motion, Ex. A.) These terms continued in effect throughout the parties' relationship, except that Plaintiff agreed to a discount price of $10.50 per print. Rentschler testified that the October 30, 1995 purchase order represented the entire agreement between the parties. (Rentschler Dep. at 12–13.)

Over the next year and a half, Rentschler flew over the construction site approximately 47 times to take construction photos. In all, Defendant selected 305 images for printing from these aerial photography shoots of the construction site. There is no dispute as to Plaintiff's delivery of the requested photos, nor as to Defendant's payment for these photos or the associated photography services.

In early 1997, the Saginaw Chippewa Tribe became dissatisfied with the progress of construction on the Soaring Eagle project and terminated Defendant. On May 23, 1997, Defendant filed an arbitration demand against the Tribe, seeking damages in excess of $40 million. The Tribe counterclaimed, alleging defective work and delays in construction.

In connection with these arbitration proceedings, Defendant contacted Plaintiff to request a quote for six sets of photocopies of the construction photos. These six sets, totaling approximately 1,830 copies, were intended for distribution to the three arbitrators, the witnesses, and each side's counsel. Plaintiff initially responded with a price of over $18,000, reflecting the standard cost of $10.50 per print that Defendant had paid throughout the parties' relationship. When Defendant complained that this price was excessive, Plaintiff offered to charge approximately $13,000 for the reprints. (Plaintiff's Motion, Ex. J.) Alternatively, Plaintiff suggested that the parties could negotiate an "image use fee" arrangement, under which Defendant would pay a per-copy fee for the right to reproduce the photos, or that Plaintiff could transfer its copyrights to Defendant at a cost of $43.50 per negative. (*Id.*)

Defendant, however, rejected these various options, believing that the quoted prices remained prohibitive. In addition, Defendant decided that all of the prices quoted by Plaintiff were for reprints, but that less expensive color photocopies would adequately serve Defendant's purposes in the arbitration proceedings. Thus, in late October of 1998, Defendant contacted a local copying service, Copy Corps, and arranged to make 2,034 color photocopies of Plaintiff's photos, at a cost of $1.00 per copy. Apparently, Defendant obtained 10 copies each of a set of 203 photos, plus four enlarged 36–by–28.5–inch copies. These photocopies were admitted into evidence in Defendant's arbitration proceedings with the Saginaw Chippewa Tribe, with additional sets of copies distributed to the arbitrators, to witnesses, and to counsel.

Upon learning of this, Mr. Rentschler advised Defendant in a October 24, 1998 letter that he held copyrights for the photos he had taken of the Soaring Eagle resort, and that these photos could not be "duplicated in any way without my permission." (Plaintiff's Motion, Ex. J.) Defendant also received a November 5, 1998 letter from the Professional Photographers of America, giving "formal notice" that Defendant reportedly had "violated the federal Copyright Act," alerting Defendant "to [its] obligations under the Act," and requesting its "voluntary compliance." (Plaintiff's Motion, Ex. M.)

When an exchange of letters between the parties' counsel failed to resolve the matter, Plaintiff brought this action. In its initial Complaint filed on August 3, 1999, Plaintiff asserted claims of copyright infringement and breach of contract.[1] On January 3, 2000, Plaintiff filed its present motion for partial summary judgment, seeking a determination in its favor as to the issue of Defendant's liability for copyright infringement. For its part, Defendant brought a motion on December 29, 1999, arguing that its reproduction of Plaintiff's photos for use in arbitration proceedings constitutes "fair use" under the federal Copyright Act, and that the par-

---

1. Pursuant to an Order of this Court, Plaintiff filed a First Amended Complaint on January 18, 2000. This amended complaint did not alter the substance of Plaintiff's claims or allegations, but merely changed the case caption to reflect the proper name of the Plaintiff corporation.

ties' failure to address photocopying in their written agreement defeats Plaintiff's breach of contract claim. On March 30, 2000, the Court heard the arguments of counsel on these cross-motions.

## III. *ANALYSIS*

### A. The Standards Governing the Parties' Cross–Motions for Summary Judgment

Both parties seek summary judgment in their favor pursuant to Fed.R.Civ.P. 56. Under this Rule, summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex:*

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

> \* The movant must meet the initial burden of showing "the absence of a genu-ine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> \* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> \* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> \* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in considering the parties' cross-motions for summary judgment.

### B. Plaintiff's Claim of Copyright Infringement

In Count I of its First Amended Complaint, Plaintiff asserts a claim of copyright infringement, alleging that Defendant's unauthorized reproduction of Plaintiff's construction site photographs violated Plaintiff's exclusive rights conferred by § 106 of the Copyright Act of 1976, 17 U.S.C. § 106. Specifically, Plaintiff contends that Defendant's use of a copying service to make color photocopies of Plaintiff's copyrighted works infringed upon Plaintiff's exclusive right "to reproduce the copyrighted

work in copies or phonorecords." 17 U.S.C. § 106(1).

In response, Defendant does not contest Plaintiff's allegation that the photographs in question were copyrighted, nor that Plaintiff holds the copyrights in these works.[2] Nor, plainly, can Defendant deny that it "reproduce[d]" Plaintiff's copyrighted photos within the meaning of § 106(1) of the Copyright Act.[3] Nevertheless, Defendant argues that it cannot be held liable for copyright infringement, because its reproduction of Plaintiff's photos is encompassed within the doctrine of "fair use."

The doctrine of fair use has existed "[f]rom the infancy of copyright protection," in recognition that a copyright holder's rights must yield where "necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575, 114 S.Ct. 1164, 1169, 127 L.Ed.2d 500 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8.) Fair use remained a judge-made doctrine until 1976, when it was codified at § 107 of the present Copyright Act:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work. . . .

17 U.S.C. § 107.

■ In this case, Defendant does not contend that it reproduced Plaintiff's photos for any of the purposes specifically enumerated in the preamble to § 107—namely, "criticism, comment, news reporting, teaching . . ., scholarship, or research." This, however, does not foreclose Defendant's appeal to the doctrine of fair use, as the examples listed in the statutory preamble are merely illustrative, and do not establish "bright-line rules" for determining what is or is not a fair use. *Campbell,* 510 U.S. at 577, 114 S.Ct. at 1170. Rather, § 107 "calls for case-by-case analysis" of the four statutory factors, and these factors "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." 510 U.S. at 577–78, 114 S.Ct. at 1170–71. Accordingly,

---

**2.** In its motion, Defendant notes that Plaintiff had not, as of that time, produced evidence of its status as copyright holder. In support of its cross-motion, however, Plaintiff attached an exhibit reflecting its efforts in May of 1999 to register its copyright in the photographs with the U.S. Copyright Office. Next, in a more recent submission, Plaintiff produced a Certificate of Registration for the photographs, showing an effective registration date of May 19, 1999.

**3.** It is important to note that, had Defendant merely used the photographic prints it purchased from Plaintiff as exhibits in the arbitration proceedings, there could be no claim of copyright infringement. *See Red Baron—*

*Franklin Park, Inc. v. Taito Corp.,* 883 F.2d 275, 279–81 (4th Cir.1989) (examining the "first sale" doctrine, which gives the purchaser of a copy of a copyrighted work the right to further distribute that copy), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 952 (1990). It was only Defendant's reproduction of those prints that implicated Plaintiff's § 106 rights in the underlying copyrighted photos. *See* 17 U.S.C. § 202 ("Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object.").

the Court now turns to an examination of these four factors as they apply to the present case.

### 1. The Purpose and Character of the Use

■ The first of the four statutory fair use factors calls for consideration of "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Not surprisingly, the parties here sharply differ in their descriptions of the "purpose and character" of Defendant's use of Plaintiff's photos, and similarly disagree as to whether this use is properly deemed "commercial" in nature. The Court likewise finds that the facts of this case do not yield an unequivocal answer to the first-factor inquiry. On balance, however, the Court finds that this factor tips slightly in Plaintiff's favor.

In assessing Defendant's reproduction of Plaintiff's copyrighted works in light of the first § 107 factor, the Court must consider whether, and to what extent, Defendant made a "transformative use" of Plaintiff's works. As stated by the *Campbell* Court, the "central purpose" of the first-factor inquiry is to determine "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579, 114 S.Ct. at 1171 (citations omitted). Similarly, in *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985), the Court found that the first § 107 factor militated against a finding of fair use, where the defendant's use of the plaintiff's work "had not merely the incidental effect but the *intended purpose* of supplanting [one of] the copyright holder's commercially valuable right[s]."

Viewed in this way, the first factor appears to heavily favor Plaintiff. Plainly, Defendant used its reproductions of Plaintiff's photos for precisely the same purpose—or, at a minimum, for one of the same purposes—as the photos themselves were intended to serve: namely, as a pictorial record of Defendant's progress on the Soaring Eagle construction project. The only "added value" of Defendant's photocopies was the convenience of presenting separate copies to the arbitrators and witnesses for their review. As explained by the Sixth Circuit, "[t]his kind of mechanical 'transformation' bears little resemblance to the creative metamorphosis" envisioned by the *Campbell* Court in its discussion of "transformative uses." *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1389 (6th Cir.1996), *cert. denied*, 520 U.S. 1156, 117 S.Ct. 1336, 137 L.Ed.2d 495 (1997).

While conceding that its use of Plaintiff's photos was not "transformative," Defendant emphasizes that the color photocopies of those photos were used solely in the arbitration proceedings between Defendant and the Saginaw Chippewa Tribe concerning construction of the Soaring Eagle resort. Defendant then seeks to draw an analogy to cases finding that the use of reproductions of copyrighted works in judicial proceedings constituted fair use. *See, e.g., Religious Technology Ctr. v. Wollersheim*, 971 F.2d 364, 367 (9th Cir.1992); *Jartech, Inc. v. Clancy*, 666 F.2d 403, 406–07 (9th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 58, 74 L.Ed.2d 62 (1982). To similar effect, Defendant quotes an excerpt from Professor Nimmer's copyright treatise:

> **Reproduction for a Judicial Proceeding** ..... [R]eproduction of a work in connection with a judicial proceeding, even where the reproduction is of the work in its entirety, serves a qualitatively different function and does not satisfy the reader demand for the original.... Although there are few ... cases on point, works are customarily reproduced in various types of judicial proceedings, including obscenity and defamation ac-

tions, to say nothing of copyright infringement actions, and it seems inconceivable that any court would hold such reproduction to constitute infringement either by the government or by the individual parties responsible for offering the work in evidence....

Nimmer on Copyright § 13.05[D][2] (footnotes with citations omitted).

Defendant recognizes that the above-cited cases are not directly on point. Indeed, a careful reading of the quoted passage from Professor Nimmer's treatise suggests a basis for distinguishing these cases: namely, in each case, the allegedly infringing materials were copies of works that played some role in the underlying facts of the case, and not works created specifically for the purpose of litigation. For example, in *Jartech, supra,* the plaintiff producers of adult movies brought suit against the defendant city council members and a city attorney, alleging that their use of excerpted portions of the plaintiffs' movies in nuisance abatement proceedings constituted copyright infringement. In upholding the defendants' appeal to the doctrine of fair use, the Court reasoned that the defendants had not made "intrinsic use" of the plaintiffs' copyrighted films—that is, use for the same purpose as the copyright holder intended. *Jartech,* 666 F.2d at 406–07. Rather, "[t]he alleged infringers made abbreviated copies of the films, not for subsequent use and enjoyment, but for evidence to be used in the nuisance abatement proceedings." 666 F.2d at 407. The Court further observed that the city council's use of the plaintiff's films "was neither commercially exploitive of the copyright, nor commercially exploitive of the copyright holder's market." 666 F.2d at 407.

Similarly, another case cited by Defendant, *Kulik Photography v. Cochran,* 975 F.Supp. 812 (E.D.Va.1997), arose from defendant Johnnie Cochran's display of the plaintiff's copyrighted work, a photograph, during televised closing argument in the O.J. Simpson trial. The plaintiff alleged that the defendants "ignored warnings about the copyrighted nature of the photograph and used the photograph knowing it would be displayed, via television, to the Commonwealth of Virginia." 975 F.Supp. at 812. After holding that the case was subject to dismissal on a number of other grounds, including personal jurisdiction and venue, and also finding that Court TV's broadcast of the trial constituted fair use under § 107 as "news reporting," the Court further noted an additional basis for concluding that the defendants had made fair use of the photograph:

> The photograph at issue had already been admitted into evidence by the presiding trial judge, and the Defendants were representing a client who faced two murder charges. This Court cannot agree that the Defendants did anything wrong in using an item of evidence already accepted into the case during their closing argument. To permit otherwise would permit the copyright laws to trump the constitutional rights of a criminal defendant.

975 F.Supp. at 814.

In this case, by contrast, Plaintiff's copyrighted photographs did not just "happen" to serve as evidence in Defendant's arbitration proceedings. Rather, they were intended to serve that purpose, among others, and Defendant made "intrinsic use" of them when it introduced them at the arbitration proceedings as demonstrative evidence of the construction work it had performed on the Soaring Eagle project. That *both* parties shared this same notion of the photos' "intrinsic purpose" is evidenced by Defendant's initial decision to turn to Plaintiff when it desired additional copies of the photos for use in the arbitration proceedings. Thus, when Defendant concluded that Plaintiff was demanding too high a price for these copies, and instead elected to use a copying service, Defendant knowingly supplanted Plaintiff's commercially valuable right to reproduce its copyrighted works for use in construction-related disputes involving the Soaring Eagle project. None of the cases upon which

Defendant seeks to rely featured a similar "supplanting use" of copyrighted material.

This Court's research has uncovered only one case addressing the fair use doctrine in light of copyrighted works created specifically for use in litigation, and this decision relies heavily on the notion of "supplanting use." In *Ross v. Miller's Rexall Drugs, Inc.*, 1991 Copyright L. Dec. (CCH) ¶ 26,786, 1990 WL 314290 (Ga.Super.Ct. Oct. 10, 1990), a Georgia court considered a motion to compel brought by defendant Rexall against a non-party photographer, George Pearl, who had formed a business to provide photographic evidence to trial lawyers for use in litigation, and who had been retained by the plaintiff to create demonstrative evidence by taking pictures of products on the shelves of a Rexall drug store. Rexall refused to pay Mr. Pearl's customary per-copy fee of $15 to obtain copies of his photographs, and instead moved to compel production of the negatives so that Rexall could make its own copies at a less expensive rate. The court rejected Rexall's appeal to the doctrine of fair use as the basis for its motion, reasoning that Rexall's proposed "copying of Mr. Pearl's negatives is a complete usurpation of his work," and that Rexall sought merely to "save the time and expense incurred by the copyright owner." 1990 WL 314290, at *1–*2 (internal quotations and citations omitted).[4]

Finally, to the extent that the § 107(1) inquiry turns upon consideration of the commercial or nonprofit use of copyrighted material, this again is a close question. On one hand, the presentation of evidence in a judicial or arbitration proceeding serves a salutary truth-seeking function, and cannot be characterized as a purely "commercial" endeavor, even though money damages might well be at stake. At a minimum, it can be said that Defendant's limited use of reproductions of Plaintiff's photos during the course of arbitration proceedings falls well short of the types of commercially exploitive actions held in other cases to weigh heavily against a finding of fair use. *See, e.g., Harper & Row,* 471 U.S. at 562, 105 S.Ct. at 2231 (finding a commercial use where the defendant magazine printed excerpts of the forthcoming autobiography of Gerald Ford with the "stated purpose of scooping the forthcoming hardcover"). Defendant here might well have acted out of expediency, but there is no indication that it intended to commercially exploit Plaintiff's works beyond the confines of the arbitration proceedings.

On the other hand, as Plaintiff points out, arbitration is often selected by the parties to a contract—and apparently was chosen here by Defendant and the Saginaw Chippewa Tribe in their construction agreement—as a commercially advantageous method of resolving business disputes, and so can be viewed as a more "commercial" endeavor than traditional judicial proceedings. Moreover, to the extent that Defendant and its counsel made strategic decisions in determining what evidence to present to the arbitrators and the most effective means of presenting it, they clearly did so with an eye toward achieving the best possible outcome in the arbitration proceedings—and this outcome, of course, was a monetary award. Finally,

---

4. In another case involving materials prepared for purposes of litigation—specifically, a copyrighted settlement brochure prepared by the plaintiff's counsel—the Court held that the defendant's counsel did not need to return a copy of the brochure received during the litigation, but that, under § 106 of the Copyright Act, defense counsel was "prohibited from making any copies of this brochure or distributing the brochure to any other person." *Khandji v. Keystone Resorts Mgmt., Inc.,* 140 F.R.D. 697, 700 (D.Colo.1992). This case, however, did not address the doctrine of fair use. For a more general discussion of fair use as it relates to litigation-related materials, see Steven D. Smit, "Make a Copy for the File: Copyright Infringement by Attorneys," 46 Baylor L.Rev. 1, 41–46 (1994) (suggesting that the outcome of the fair use inquiry should turn upon whether the copyrighted work is "unique" or "publicly available," and reasoning that, in the latter case, unauthorized copying would "supplant[ ] the need for authorized copies of the work—a factor that strongly militates against a finding of fair use").

as the Supreme Court has explained, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562, 105 S.Ct. at 2231. Here, the parties entered into an agreement setting forth the "customary price" for additional prints of Plaintiff's photos, but Defendant elected to obtain additional copies without paying this price—or, indeed, any price at all, so far as Plaintiff was concerned.

In sum, taking all of the above into account, the Court concludes that the first § 107 factor tends to weigh against a finding of fair use. Defendant argues persuasively that the evidentiary use of copyrighted materials in a judicial or quasi-judicial proceeding cannot be characterized as "commercially exploitive" in any traditional sense, but instead serves the laudable goal of ensuring that the trier of fact is presented with all of the evidence in a manner that the parties deem most effective. Yet, the Court cannot overlook the complete absence of any "transformative use" in Defendant's mere reproduction of Plaintiff's photos. Moreover, two facts take on great significance in the Court's first-factor inquiry: (1) that Plaintiff was retained in part to create a photographic record of Defendant's construction efforts in the event that a dispute arose; and (2) that the agreement between Plaintiff and Defendant specifically established the price for additional copies of Plaintiff's works. Given these facts, the Court cannot help but conclude that Defendant's reproductions wholly "supplanted" Plaintiff's commercially valuable—and, under § 106, exclusive—right to reproduce its own photos, a right expressly recognized by both parties when they entered into their agreement. This "supplanting use" tips the first-factor balance toward Plaintiff.

### 2. The Nature of the Copyrighted Work

The next factor in the statutory fair use inquiry is the "nature of the copyrighted work." 17 U.S.C. § 107(2). "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586, 114 S.Ct. at 1175. Thus, when considering this factor, the courts distinguish between more "creative" works, such as musical compositions or works of fiction, and more information or functional works, such as bare factual compilations. *See Campbell*, 510 U.S. at 586, 114 S.Ct. at 1175.

In this case, Defendant argues that Plaintiff's photos are more functional than creative, as they merely serve as a factual record of the progress of construction at the Soaring Eagle site. In response, Plaintiff asserts that photographs are inherently creative, since a photographer must make decisions on such creative matters as lighting, angle, framing, and timing, with the result that no two photos of the same subject will be entirely alike. *See Time Inc. v. Bernard Geis Assocs.*, 293 F.Supp. 130, 141–43 (S.D.N.Y.1968). Plaintiff further notes that photos like the ones at issue here are not used exclusively as visual "factual compilations" in construction-related dispute, but also can often be found adorning the walls of construction companies as a form of commercial art.

Although this factor, like the first, does not decisively favor either party, the Court finds that Plaintiff has the better argument. To be sure, one of the intended purposes of Plaintiff's works, and the principal purpose for which Defendant used them in the arbitration proceedings, is as a factual record of construction progress. Yet, if the photos served only this dry, factual purpose, Defendant presumably could have found other, equally effective ways to introduce evidence at the arbitra-

tion proceedings of its performance on the Soaring Eagle project—for example, documentary records of its progress, or testimony of personnel who worked at the site.

A picture, however, is worth a thousand words. What is more, Defendant did not simply instruct one of its employees to take pictures of the construction site: it hired a commercial photographer to perform this task. Then, when determining how best to present its case to the arbitrators, Defendant chose to offer these commercial-quality photographs into evidence. In so acting, Defendant evidently concluded that Plaintiff's works captured the various stages of the project in a way that no other form of evidence could. This is precisely the creative insight provided by a professional photographer, whether he is shooting a construction site or a natural scene. In short, the demonstrative value of Plaintiff's works is what sets them apart from the other forms of evidence available to Defendant; they are not merely one of several interchangeable sources of "brute facts" about the progress of construction. Consequently, the Court finds that Plaintiff's photos lie more at the creative than at the functional end of the spectrum of copyrighted works, and that the second § 107 factor, therefore, weighs in Plaintiff's favor.

### 3. The Amount and Substantiality of the Portion Used

The third factor set forth in § 107 is the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor clearly favors Plaintiff, and Defendant does not argue otherwise. Defendant reproduced Plaintiff's photos in their entirety, and apparently copied 287 of the 305 photos Plaintiff previously had provided.[5] Moreover, Defendant made color photocopies of Plaintiff's photos, thereby producing near-exact replicas of the original works. This factor, then, weighs decidedly against a finding of fair use.

### 4. Effect on the Potential Market

■ Finally, § 107 calls for consideration of "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The Supreme Court has stated that "[t]his last factor is undoubtedly the single most important element of fair use," *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233, and the Sixth Circuit has observed that this factor "is at least *primus inter pares*, figuratively speaking," *Princeton Univ. Press*, 99 F.3d at 1385. This factor requires assessment of both actual and potential market harm. *Campbell*, 510 U.S. at 590, 114 S.Ct. at 1177.

Much of the Court's first-factor analysis applies here as well, and dictates the conclusion that the fourth factor favors Plaintiff. Defendant argues that its limited use of unauthorized reproductions in an arbitration proceeding cannot pose any substantial threat to the market for Plaintiff's works. Defendant points out, for example, that it is unlikely that its limited use of Plaintiff's photos would inhibit sales of those photos to other contractors who worked at the Soaring Eagle site. Moreover, there was no widespread distribution of Plaintiff's works, and Defendant did not place itself in the position of a direct competitor, seeking to sell or provide copies of the works to those who otherwise might purchase copies from Plaintiff.

These arguments lose much of their force, however, when it is recalled that litigation was specifically contemplated, by *both* parties, as one of the principal "markets" for Plaintiff's photos. Given this agreed-upon determination of the relevant markets for Plaintiff's works, there can be no doubt that Defendant's reproductions directly harmed—in fact, entirely eliminated—one of these markets. As the *Campbell* Court observed, "when a commercial use amounts to mere duplication of the entirety of an original, it clearly 'supersede[s] the objects' of the original and serves as a market replacement for it,

---

**5.** According to Plaintiff, Defendant did not have 8–by–10 prints of the remaining photos,

and chose to reproduce only the 8–by–10 prints.

making it likely that cognizable market harm to the original will occur." *Campbell,* 510 U.S. at 591, 114 S.Ct. at 1177 (citation omitted). Even though, as discussed above, Defendant's use in this case was not purely commercial, it nevertheless wholly superseded one of the principal objects of Plaintiff's photos, and thereby displaced a key market for those works.

Further, the fourth fair use factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original." *Campbell,* 510 U.S. at 590, 114 S.Ct. at 1177 (citation omitted). In this case, if works intended for use in litigation could be freely copied without payment to or permission from the copyright holder, there soon would cease to be any viable marketplace for such works. At a minimum, the creators of such works would be forced to recover their costs and desired profits "up front," at the point of first sale of a copy of the works, since the purchasers would then be free to make further copies as they wished. While parties always are free to make such arrangements—as Defendant could have done here, given its awareness that Plaintiff's photos might well prove useful in any ensuing dispute resolution proceedings—the Court is unwilling to declare, as a matter of copyright law, that litigation is wholly off limits as a potential market for copyrighted works.

Accordingly, in light of the parties' mutual recognition that Plaintiff's photos likely would be used in any construction-related disputes, and their agreement as to the cost of additional reprints of these photos, the Court finds that Defendant's unauthorized reproduction of Plaintiff's photos substantially impaired one of the intended markets for the works. Moreover, such unauthorized reproduction, were it to become more widespread, would severely jeopardize the potential market for works intended for use in litigation. It follows that the fourth factor weighs decisively against a finding of fair use.

### 5. Summary of Fair Use Factors

■ In sum, while some of the § 107 factors provide more definitive guidance than others, the Court has now surveyed them all in light of the circumstances of this case, and has found that all four tip in Plaintiff's favor and against Defendant's appeal to the doctrine of fair use. In so concluding, the Court is cognizant of the risk that copyright protection might undermine the truth-seeking function of judicial and quasi-judicial proceedings. *See, e.g., Kulik Photography, supra,* 975 F.Supp. at 814; *Grundberg v. Upjohn Co.,* 137 F.R.D. 372, 388 (D.Utah 1991). Moreover, the Court readily acknowledges the important role that the doctrine of fair use can play in minimizing this risk. *See, e.g., Wollersheim, supra,* 971 F.2d at 367; *City Consumer Servs., Inc. v. Horne,* 100 F.R.D. 740, 747–48 (D.Utah 1983). Certainly, under appropriate circumstances, the Court would not hesitate to conclude that copyright protection must yield to the need to present a complete evidentiary record.

Yet, the Court cannot ignore the important distinction between copyrighted works that happen to capture information that proves relevant to subsequent litigation, and works that are intended to capture such information, specifically for the purpose of litigation. In the latter case, where judicial proceedings are one of the intended markets, the copyright holder is entitled to exercise control over the use of his works within this market; the fair use doctrine does not require the wholesale abandonment of copyright protection at the courthouse door. Because it does not, it is irrelevant whether Plaintiff demanded an excessive price for additional copies of its photos, or whether it could have been more reasonable in permitting reproduction in color photocopies rather than photographic reprints. As a copyright holder, Plaintiff generally was under no obligation to be reasonable. Rather, beyond establishing the contours of the rights con-

ferred, copyright law leaves such considerations of "reasonableness" to be governed by traditional market principles.[6]

## IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's Motion for Partial Summary Judgment is GRANTED. IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is DENIED.

6. So far as the Court can determine, Defendant's opposition to Plaintiff's motion for partial summary judgment rests solely on the doctrine of fair use, and not on any other possible defenses. Having rejected Defendant's appeal to fair use, the Court necessarily must award partial summary judgment to Plaintiff on the issue of liability for copyright infringement. A determination of damages must await further proofs.

Next, as noted earlier, Defendant also seeks summary judgment in its favor on Plaintiff's breach of contract claim. In light of the Court's ruling on Plaintiff's claim of copyright infringement, the Court believes that Plaintiff's contract-based theory of recovery is now moot. In particular, because Defendant's reproductions of Plaintiff's photos constitute acts of copyright infringement, it does not matter whether, as Defendant argues, the parties' contract was silent on additional photocopies of Plaintiff's photos, and thus did not prohibit Defendant's photocopying.